People of the State of Illinois ex rel. Edward J. Barrett,
Appellee, v. Bank of Peoria et al., Appellees.
Charles V. O'Hern, Appellant.

Gen. No. 9,247.

Opinion filed May 10, 1938.  Rehearing
denied June 14, 1938.

CASSIDY & KNOBLOCK and GEORGE W. HUNT, both of
Peoria, for appellant; JOHN E. CASSIDY, GEORGE W.
HUNT and JOHN E. CARLSON, of counsel.

· Todd, Morgan, Pendarvis & Arber and Bartley & Younge, both of Peoria, for appellees.

Mr. Justice Huffman delivered the opinion of the court.

This is an appeal by Charles V. O'Hern as receiver of the Peoria Life Insurance Company from a judgment of the circuit court of Peoria county, denying his claim against the receiver of the Bank of Peoria in the sum of $314,060. Certain creditors of the bank became parties to the suit by leave to intervene, filing their objections to the allowance of the claim, and are also appellees herein.

Pursuant to statute, the Bank of Peoria was organized with a capital stock of $200,000 and a surplus of $25,000. The stock consisted of 2,000 shares having a par value of $100 each. Ten individuals subscribed to the entire authorized capital stock and surplus. Thereafter the cash was verified by a representative of the auditor's office and final certificate of organization issued under date of October 16, 1924. On December 19, 1924, there was filed in the office of the recorder of said county, a report of the transfer of 1,660 shares of the stock from five of the individual subscribers to the Peoria Life Insurance Company, which report discloses said shares to have been so transferred on the day previous to the filing of the report. The annual statement of the Life Insurance Company disclosed an investment of $186,750 in stock of the Bank of Peoria.

In September, 1932, a representative of the auditor's office recommended to the bank directors that they make arrangements to take care of certain assets to which the auditor's office objected. The directors decided that the most advisable way to take care of these nonacceptable assets was by a contribution by the stockholders of 25 per cent of the par value on such shares as held by the respective owners. The Insur-

ance Company at this time had sold 95 shares of the stock. This left it with 1,565 shares. The Insurance Company complied with the voluntary stock assessment plan on its 1,565 shares by giving its note to the bank for $39,000, and paying $125 in cash. This note was later paid in full with $871 interest added. The bank was closed in March, 1933, under the national moratorium. Following this, the auditor required $295,000 to be raised and certain objectionable assets removed before he would permit the bank to reopen. The directors of the bank decided upon a 75 per cent stock assessment to assist in reopening the bank. Pursuant to this action, the Life Insurance Company paid to said bank the sum of $117,375, which with the $39,125 previously paid upon the 25 per cent assessment, made a total paid in of $156,500, being equal to a 100 per cent assessment upon its 1,565 shares. The other stockholders likewise paid the assessment. The bank reopened on March 24, 1933. It continued to operate until November 15, 1933, when it was placed in the hands of the auditor's office and proceedings subsequently instituted to liquidate and wind up its affairs. The claim of appellant in this case consists of two items, namely, the $156,500 paid by the Insurance Company on stock assessments, and the sum of $157,560 which appellant claims is due from the amount paid for the purchase of the stock, after allowing all just credits and offsets against the original purchase price. This makes a total claim as filed by appellant, of the sum of $314,060.

Appellant urges that it was the intention of the officers and directors of the Insurance Company to engage in the banking business, contrary to its chartered powers, and therefore the diversion of funds was unlawful and fraudulent; that the stock assessments were subject to the same objection; and that the bank stock held by the Insurance Company was not such an invest-

ment as contemplated by statute, but was made for the purpose of creating an unlawful monopoly. In this respect, appellant argues that if the purpose of an investment is to acquire interest or dividends, then the investment is bona fide, but if the purpose is to acquire control and management by means of the power to vote stock, then the transaction is not such an investment as contemplated by statute, and unless such right is contained in the charter, the transaction is wholly void. In support of this contention appellant cites the case of *Robotham v. Prudential Ins. Co.,* 64 N. J. Eq. 673, 53 Atl. 842. This appears to be the main contention of appellant, and the above case one upon which appellant strongly relies. In that case, the directors of the Prudential were proposing to use $8,000,000 or $10,000,000 of the funds of that company for the acquisition of a sufficient number of shares of the Fidelity Trust Company to give the Prudential Company a majority of the capital stock of the Fidelity Company, and as a part of the plan the Trust Company was to acquire a controlling interest in the stock of the Insurance Company, in order to put the assets of the Insurance Company "forever beyond the reach of reckless speculators." The Prudential stock then had a market value of approximately $400 per share. Certain of the stockholders of the Prudential Company brought suit to enjoin the proposed action, claiming that such was not an investment of the Insurance Company's funds as contemplated by statute and was but an attempt to perpetuate the control of both institutions contrary to the chartered powers of the Insurance Company. The Prudential already had acquired a substantial stock interest in the Fidelity Trust Company and the business relations between the two companies had been intimate and profitable to each. The board of directors of the Fidelity Company consisted of eighteen members, seven of whom were also directors

of the Prudential Company, and constituted one-half of its board of directors. The opinion in the above case is long, consisting of some 40 pages, but the conclusion of the court was that upon the whole of the case as presented, the Prudential Company and its directors should be enjoined from subscribing for the proposed new issue of Fidelity stock, which was to be issued in order that the plan might be consummated, as the purpose of such action was unauthorized by the statutes. We find nothing to indicate that the stock of the Fidelity Company already held by the Prudential Company was in any way wrongful and the court expressly stated that the injunction against the proposed plan to carry out the scheme of lodging perpetual control of the two companies in the directors of either or both of them, should in no way interfere with the power of the Prudential Company to vote the stock in the Fidelity Company which it already owned, either at that time with reference to the proposed increase of the capital stock of the Fidelity Company, or at any other time.

Appellee denies all charges of wrongful or fraudulent use of the Insurance Company's money, and denies any intention to create a monopoly. It urges that the investment of funds in the bank stock and all subsequent acts relative thereto, were legal; that the argument of appellant that such acts were wholly void in the first instance, is unavailing, as the Insurance Company had the power to so invest its funds, and that if such acts were ultra vires, they were not so because of the want of power, but because of an irregular exercise thereof; that the entire transactions are fully executed and any irregularities which existed, were mutual as between the Insurance Company and the bank, and in this respect the parties were in *pari delicto*.

It appears that the annual statements and reports required by the statute to be filed by the Peoria Life Insurance Company with the State department, dis-

closed each year its investment in stock of the Bank of Peoria, together with the cost thereof, the book value, and the par value, as well as stock held in other banks. Appellee urges that under the statutes then in force (Cahill's Ill. St. 1923, ch. 73, §§ 334, 368), it was lawful for the Insurance Company to invest its funds in the capital stock of the Bank of Peoria, and that it was also lawful for it to pay the stock assessments in order to protect its investment in the bank stock as well as to protect its deposit in such bank, which at that time was in excess of $300,000. The investment in the bank stock and the payment of contributions thereon were authorized by the board of directors. Appellee urges that even though such acts were irregular, they were fully completed and appellant as receiver could not now recover the money so paid. It is further urged by appellee that appellant as receiver stands in the place of the Insurance Company and is clothed with no greater powers than the company he represents; that he does not represent its creditors; that he takes the rights of the corporation as he finds them and can assert the same only to the extent the corporation itself could do. (Citing *Republic Life Ins. Co. v. Swigert,* 135 Ill. 150.) To the same effect is *Evans v. Illinois Surety Co.,* 298 Ill. 101, 109.

Appellant insists that the acts of the Insurance Company in the purchase of the bank stock and payment of the assessments thereon were absolutely null and void, claiming it had no such power, that the transactions were expressly prohibited by statute and therefore not binding on the Insurance Company, as the law does not prohibit and at the same time enforce a contract. The term ultra vires as commonly used, is generally applied to two situations—one, where the corporation has no power whatever to do the act—and the other, where the corporation has the power to do the act and there is an irregular exercise of such power.

It is appellant's position that the acts of the Insurance Company fall within the first above mentioned group, while it is the appellees' position that if the acts of the Insurance Company could be considered ultra vires, they fall within the second mentioned group, and render unavailing the charge of ultra vires as made by appellant.

Appellant insists that the rule as announced in *Republic Life Ins. Co. v. Swigert, supra,* is no longer applicable under the present insurance law. It claims that since the act of 1925 and the amendment of 1929, whereby the power to appoint a receiver was taken from the courts and vested in the director of insurance, that a receiver's powers were thereby enlarged so as to constitute him the representative of all creditors in such a manner as to abbrogate the rule as announced in *Republic Life Ins. Co. v. Swigert, supra,* citing in support of this contention the case of *People ex rel. Palmer v. Niehaus,* 356 Ill. 104. We do not find any language in that opinion holding that the powers of a receiver were increased as claimed. Nor do we find that the Act of 1925 as amended in 1929, extends the authority or rights of a receiver beyond that of the property, contracts, and rights of action of the company, as of the date of the order directing the liquidation [Cahill's Ill. St. 1931, ch. 73, § 105 (4)]. Counsel does not refer us to any portion of the above opinion or of the above act, enlarging the powers and rights of a receiver, to those as set out in *Republic Ins. Co. v. Swigert, supra.*

There was a time when the nation's business was carried on by relatively small and independent units. Each kind of business enjoyed a large measure of freedom, producing whatever it pleased and in any way it pleased. Under this system the country made rapid economic progress. However, during the last half century, well managed and successful business

enterprises have grown in size until as a matter of economic administration it became expedient to combine and bring together under one management, the component elements contributing toward its successful and profitable operation. This change has not been confined to business enterprises alone, but has manifested itself in every form of human endeavor. When business units combine in such way that competition ceases and they co-operate with one another against the public good, then monopoly may be said to have become a significant element. But here, the holding of this bank stock by the Insurance Company can hardly be classified as an attempt to create a monopoly. The ownership of the bank stock by the Insurance Company no doubt came about through a desire to invest its funds in a useful and profitable manner. The fact that the respective parties might have anticipated the investment would be mutually profitable, within itself, does not serve to render the same a wrongful and fraudulent use of the Insurance Company's funds. In an era of prosperity, speculation is widespread. Such conditions produce an expansion of credit, all of which combine to make the banking business one of exciting promise as a profitable and attractive investment.

Successfully managed insurance companies accumulate funds rapidly, which should be put to work. An example of this appears in the case of *Robotham v. Prudential Ins. Co., supra.* The Prudential Insurance Company began its corporate existence in 1873, under the name of the Widows' and Orphans' Friendly Society. The name of the corporation was twice changed, the last being to the Prudential Insurance Company of America. In 1903, when the above case was heard, the stock of that company then had a market value of $400 per share, which was eight times in excess of its par value.

Life insurance companies are so closely related to the welfare of society that the various States have by statute provided for the supervision of their conduct. The Peoria Life Insurance Company was under supervision of the State department, as provided by statute. Its annual statements and reports were filed as provided by statute, from the year 1924, when it became the owner of this bank stock, to the time of the closing of the bank in 1933. Its conduct with reference to the stock was reflected by its annual reports. No objection appears to have been made by the State department with reference thereto. Under the circumstances as they appear by the record, we do not find that the conduct of the directors of the Insurance Company was corrupt or culpable, or that the investment of the funds in the bank stock was wrongful, fraudulent, or illegal. It is true that this particular investment proved to be unwise, but an investment in any enterprise is attended with the hazards of that particular business, and the investor, if he be solicitous of the funds used, is always harried by fear. Conditions which inspire a feeling of complete confidence are subject to change. The outcome of invested capital cannot be foretold.

It is with an understanding compassion we view situations as presented herein. It is not to be presumed that men having their own capital invested in an enterprise, will voluntarily bring about its financial collapse. However, it is not to be unexpected that such will occur when sudden financial distress arises in a time of economic depression and overexpansion of credit.

The judgment herein will be affirmed.

*Judgment affirmed.*