James W. SCHACHT, the Acting Director of Insurance of the State of Illinois and Liquidator of Reserve Insurance Company, Plaintiff-Appellee,

v.

Isadore BROWN, et al., Defendants-Appellants.

Nos. 82–2088, 82–2089, 82–2090.

United States Court of Appeals, Seventh Circuit.

Argued Dec. 10, 1982.

Decided April 8, 1983.

As Amended on Denial of Rehearing and Rehearing En Banc July 1, 1983.

Certiorari Denied Nov. 28, 1983. See 104 S.Ct. 508, 509.

---

Jerold S. Solovy, Donald R. Harris, Jayne W. Barnard, Marguerite M. Thompkins, Jenner & Block, Sheldon Karon, Victor G. Savikas, Richard L. Horn, Dwight B. Palmer, Karon, Morrison & Savikas, Ltd., Chicago, Illinois, for Individual defendants.

Ronald A. Jacks, James B. Burns, David M. Spector, Steven R. Gilford, Edward R. Gower, Isham, Lincoln & Beale, Chicago, Illinois for SCOR and SCOR RE.

Charles W. Boand, Robert F. Forrer, Quinton F. Seamons, Dennis J. O'Hara, Wilson & McIlvaine, Chicago, Illinois, for Arthur Andersen & Co.

Powell Pierpoint, Jay Kelly Wright, John V. Geise, Hughes Hubbard & Reed, New York City and Robert G. Schloerb, John W. McCullough, Richard T. Greenberg, F. Dennis Nelson, Peterson, Ross, Schloerb & Seidel, Chicago, Illinois, for Coopers & Lybrand.

William Bruce Hoff, Jr., Stanley J. Parzen, Richard A. Salomon, Hope G. Nightingale, Mayer, Brown & Platt, Chicago, Illinois, for Alexander Grant & Co.

Raymond J. Smith, Burke & Smith, Ellen G. Robinson, Chicago, Ill., for plaintiff-appellee.

Before CUMMINGS, Chief Judge, WOOD, Circuit Judge, and HOFFMAN, Senior District Judge.[*]

HARLINGTON WOOD, Jr., Circuit Judge.

This is an interlocutory appeal from the district court's order denying defendants' motion to dismiss the complaint; it was certified to this court for resolution of controlling questions of law, pursuant to 28 U.S.C. § 1292(b). While the district court did not limit its certification to a particular question, it stated that it viewed the "controlling question" to be whether the plaintiff may sue for the type of injury he alleges here under the Racketeer Influenced and Corrupt Organizations Act, 18 U.S.C. §§ 1961–1968 (hereinafter, RICO). In order to reach this jurisdictional issue, however, we find it first necessary to determine the standing of the plaintiff, the Director of Insurance of the State of Illinois (Director), who is the statutory liquidator of Reserve Insurance Company (Reserve), to maintain

[*] The Honorable Walter Hoffman, Senior District Judge of the Eastern District of Virginia, is sitting by designation.

the action, and to determine the sufficiency of the complaint. We conclude that the Director has standing, that his complaint is sufficient, and that it alleges an injury which may be redressed by a civil action under RICO.

## I. *Factual Background*

Although the alleged events giving rise to this action are complex, they may be outlined briefly for the purposes of this appeal. The main focus of the allegations is that, as a result of the fraudulent actions of the various defendants, Reserve's corporate parent was caused to continue Reserve in business even though the latter was insolvent, and was caused to saddle Reserve with additional liabilities and drive it deeper into insolvency, all of which consequences resulted in damage to Reserve, as well as its policyholders and creditors, exceeding $100,000,000.

The complaint recites that, as of December 31, 1974, Reserve was insolvent as a result of its policy of accepting extraordinarily high-risk insurance business and underreserving and maintaining insufficient surplus for potential claims. In late 1974, the Director alleges, the Illinois Department of Insurance became concerned about the diminution of Reserve's surplus, and initiated negotiations with the officers and directors of Reserve and American Reserve Corporation (ARC), Reserve's corporate parent, to rectify the problem. While these negotiations were proceeding, however, the officers and directors of Reserve and ARC caused their companies to enter into an agreement with defendants Societe Commerciale De Reassurance (SCOR), a deal brokered by SCOR Reinsurance Company (SCOR Re). Under the terms of this agreement, Reserve ceded to SCOR most of its more profitable and least risky business (in return for SCOR's payments of commissions to Reserve), most of which business SCOR in turn secretly retroceded to another ARC subsidiary, Guarantee Reserve Co., Ltd. (GRC). Also, because the capitalization of GRC was insufficient to cover the potential losses involved in this retrocession, the Director alleges, ARC's officers and Directors secretly agreed to guarantee GRC's obligations to SCOR. The purpose of these agreements, the Director charges, was to enable Reserve to report on paper a smaller volume of business and an increase in surplus and thus a lower liability-to-surplus ratio, a fraudulent result which concealed and exacerbated Reserve's actual insolvency.

By concealing Reserve's continued liability for the retroceded business and hence Reserve's continued insolvency, the Director alleges, the defendant directors and officers were able to fraudulently obtain approval of the Illinois Department of Insurance for the cession agreements and were able to reach a consent agreement with the Department in April, 1975 which enabled Reserve to continue operations if certain surplus requirements were met. In addition, the subsequent continuation of these concealments effected through the SCOR agreements enabled Reserve's officers to violate the explicit surplus maintenance requirements of the consent agreement, the Director avers, while the SCOR agreements had the further cumulative effect of draining away from Reserve its more profitable and less risky business and over $3,000,000 in income. If the Department had at any time known of Reserve's actual insolvency, the complaint charges, it would not have permitted Reserve to continue to write insurance and suffer further dissipation of its assets, but would have caused Reserve to stop writing insurance pursuant to Ill.Rev. Stat., ch. 73, § 756.1 (1981). The complaint alleges that defendants SCOR and SCOR Re were aware of the fraudulent purposes (and the further crippling impact upon Reserve) of the underlying agreements which they entered into and brokered. The director further alleges that the defendant accounting firms, Coopers and Lybrand, Alexander Grant and Co., and Arthur Andersen and Co., knew of Reserve's insolvency and of the further impairing effect of the SCOR agreements and Reserve's continued operations, but that, despite this knowledge, each of them prepared unqualified opinion letters as to ARC's consolidated financial statements in 1974, 1975, 1976 and 1977, even though those statements failed to disclose that the SCOR agreement was entered into to conceal Reserve's insolvency, that the SCOR agreement did not remove any substantial risk of loss from Reserve and ARC, that the SCOR arrangement had been used to evade the consent agreement, that Reserve was at all times insolvent, and that the SCOR arrangement resulted in the multiplication of Reserve's high risk business while draining it of its least risky and most profitable business. In short, the Director claims that SCOR, SCOR Re and the accounting firm defendants joined with ARC and Reserve's officers and directors in

# 1346

a multifaceted, fraudulent scheme which kept Reserve operating long past insolvency in a manner which resulted in enormous losses to the latter company.

In 1979, Reserve was finally adjudicated insolvent and the Director was designated as the Liquidator of Reserve pursuant to Ill.Rev.Stat., ch. 73, §§ 799 *et seq.* (1981). Under that statute, the Director is vested with all rights of action belonging to Reserve. Ill.Rev.Stat., ch. 73, § 805 (1981). Pursuant to that mandate, the Director filed this action in district court in 1981, seeking relief for damages sustained by Reserve as a result of the alleged fraudulent scheme under RICO and a variety of Illinois statutory and common law theories. In January, 1982, the district court granted the defendants' motion to dismiss fifteen pendant state law claims, but denied their motion to dismiss Counts II and IV, seeking relief under RICO, and Counts I and III, alleging and seeking relief for damages resulting from a criminal conspiracy under Illinois law.

After discovery had commenced, the district court denied defendants' motion to reconsider, but certified its order to this court for an interlocutory appeal; we thereafter granted defendants' petition for interlocutory appeal. The defendants' chief contention on appeal is that the district court lacks jurisdiction over the present matter because Reserve's injuries as alleged in Count II and Count IV of the Director's complaint are not actionable under RICO's civil damage provision, 18 U.S.C. § 1964(c), but some of the defendants also argue that, even assuming that RICO applies, the Director still lacks standing to maintain the present action, and that in any event the Director's complaint insufficiently invokes the formal elements of a RICO claim. We first address the defendant's standing arguments, and then consider defendants' RICO-related contentions.

## II. *The Director's Standing: Capacity and Equitable Estoppel*

RICO considerations aside, defendants Grant, Coopers and Lybrand, Arthur Andersen, and SCOR and SCOR Re argue that the Director either lacks standing *ab initio* to maintain the present action or is estopped from doing so.[1] Their main argument proceeds in two stages. First, they note, the Director as Liquidator acquires only those rights of action that would accrue to Reserve itself; the Director may not assert the legal claims of Reserve's policyholders or creditors. As the next step, they argue that since the Director admits that Reserve's officers and directors instigated the illegal conduct here, the Director, standing in the shoes of Reserve, is estopped[2] from proceeding against the extra-corporate confederate defendants under our decision in *Cenco, Inc. v. Seidman & Seidman,* 686 F.2d 449 (7th Cir.1982). SCOR and SCOR Re argue additionally that, *Cenco* considerations aside, prevailing law does not permit an insurance liquidator to pursue on behalf of the corporation he represents claims for losses stemming from the artificially and fraudulently prolonged life of the corporation and its consequent dissipation of assets.

■ Even accepting the first step of the defendants' argument,[3] *i.e.*, that the Di-

1. The other defendants, directors and officers of Reserve and ARC, do not challenge in their brief on appeal the Director's right to proceed against them on any basis other than RICO.

2. Some defendants have also characterized this procedural bar as a substantive one, arguing that the complaint must fail because its facts demonstrate that the Director will be unable to demonstrate *causation* of fraud, given the corporation's imputed knowledge. Because both characterizations raise the same issue, both will be dealt with under the "estoppel" heading.

3. Although we need not reach the question for the purpose of this appeal, we note our agree-

ment with the proposition that the Director may pursue no action which could not have been asserted directly by Reserve before liquidation. This conclusion is supported first by the plain text of the statute which provides that the Director as Liquidator "shall be vested by operation of law with the title to all property, contracts and *rights of action of the company* as of the date of the order . . . directing liquidation." Ill.Rev.Stat., ch. 73, § 803 (emphasis added).

Second, a century of interpretation of this and its predecessor provisions has established the basic rule that "where a receiver is appointed for the purpose of taking charge of the property and assets of a corporation, he is, for

rector may prosecute only those legal actions available to the corporate body, we disagree with the defendants' contention that *Cenco* applies to the instant case, or that, even if it does apply, its underlying policy forbids the Director from maintaining the present action on behalf of Reserve. In addition, we reject SCOR and SCOR Re's fallback position that Reserve lacks standing to sue, either derivatively or through a receiver, to recover damages resulting from the fraudulently extended life of the corporation and its concomitant dissipation of assets.

Our reasons for finding *Cenco* inapplicable to the estoppel issue in the present case are twofold. First, the main controverted claim in *Cenco* arose under Illinois common law, and therefore this court's analysis of circumstances under which the knowledge of fraud on the part of the plaintiff's directors be imputed to the plaintiff corporation were merely an attempt to divine how Illinois courts would decide that issue. *Cenco,* 868 F.2d at 455. By contrast, the cause of action here arises under RICO, a federal statute; we therefore write on a clean slate and may bring to bear federal policies in deciding the estoppel question.

Second, even if the estoppel holding in *Cenco* were relevant to a RICO claim, an

important prerequisite for its invocation in the present case is lacking. The *Cenco* court limited its estoppel analysis to cases where "the managers are not stealing from the company ... but instead are turning the company into an engine of theft against outsiders." *Cenco,* 686 F.2d at 454. As the court explained,

> Fraud on behalf of a corporation is not the same theory as fraud against it. Fraud against the corporation usually hurts just the corporation; the stockholders are the principal if not only victims.... But the stockholders of a corporation whose officers commit fraud for the benefit of the corporation are beneficiaries of the fraud.

*Id.* at 456. In *Cenco,* this court found that the fraudulent inflation of the corporation's inventories and hence stock prices clearly benefited the corporation to the detriment of outside creditors, stock purchasers and insurers; this fact, in the court's view, made the case ripe for an analysis of whether the directors' knowledge of the fraud should be imputed to the benefited corporation. By contrast, the complaint in the instant case alleges a far-reaching scheme in which, as a consequence of the illegal activities of Reserve's directors and the outside defendants, Reserve was, *inter alia,*

---

the purpose of determining the nature and extent of his title, regarded as representing only the corporate body itself, and not its creditors or shareholders.... [H]e takes only the rights of the corporation such as could be asserted in its own name, and that upon that basis, only, can he litigate for the benefit of other shareholders or creditors." *Republic Life Insurance Co. v. Swigert,* 135 Ill. 150, 167, 25 N.E. 680 (1890); *People ex rel. Barret v. Bank of Peoria,* 295 Ill.App. 543, 549, 15 N.E.2d 333, 335–36 (1938); *Sangamon Loan & Trust Co. v. People's Savings Bank & Trust Co.,* 204 Ill.App. 7, 14 (1917); *Golden v. Cervenka,* 278 Ill. 409, 437, 116 N.E. 273, 284 (1917); *see also* 19 Appleman, Insurance Law and Practice, § 10682 at 122, 123 (1982); 2 Couch on Insurance 2d, § 22:48 (1959). A narrow exception to this rule has been permitted where, unlike here, the receiver sues to recover on behalf of a plaintiff's creditors a specific asset from a defendant who has, with the knowledge of the plaintiff's corporate officials, misrepresented its existence. *Sangamon,* 204 Ill.App. at 14; *Golden,* 278 Ill. at 427; *see also Wheeler v.*

*American National Bank,* 347 S.W.2d 918, 925 (Tex.1961); *Magnusson v. American Allied Insurance Co.,* 290 Minn. 465, 189 N.W.2d 28, 33 (1971). *Bonhiver v. Graff,* 311 Minn. 111, 248 N.W.2d 291 (1976) and *McTamany v. Day,* 23 Idaho 95, 128 P. 563 (1912), cited by the Director, are distinguishable. The statute involved in *Bonhiver,* Minn.Stat.Ann. § 60B.25(13), authorized the liquidator to assert claims of creditors and policyholders, while in *McTamany,* the court held only that the receiver could proceed on behalf of creditors and policyholders against the insolvent company's directors, not extracorporate parties. *McTamany,* 128 P. at 565. In any event, to the extent that either of these cases can be read to authorize an insurance liquidator to pursue claims more extensive than those accruing to the corporation itself, they conflict with the clear rule fashioned by the Illinois courts and the leading authorities. It is therefore incumbent upon this court not to effect innovation in what appears to be settled state law. *Murphy v. White Hen Pantry Co.,* 691 F.2d 350, 355 (7th Cir.1982).

fraudulently continued in business past its point of insolvency and systematically looted of its most profitable and least risky business and more than $3,000,000 in income—all actions which aggravated Reserve's insolvency. In no way can these results be described as beneficial to Reserve.[4] *Compare Security America Corp. v. Schacht,* No. 82–C–2132, slip op. at 3, 4 (N.D.Ill. Jan. 31, 1983) ("particular fact pattern" established that plaintiff corporation had been created solely to carry out fraudulent scheme and thus had no other purpose than to be "engine of theft" against outsiders under *Cenco* ).

Defendants argue nonetheless that since the alleged fraudulent scheme had the effect of continuing Reserve's active corporate existence past the point of insolvency to the detriment of outside creditors and policyholders, Reserve was *pro tanto* benefited. But the fact that Reserve's existence may have been artificially prolonged pales in comparison with the real damage allegedly inflicted by the diminution of its assets and income. Under such circumstances, the prolonged artificial insolvency of Reserve benefited only Reserve's managers and the other alleged conspirators, not the corporation. *See In re Investor's Funding Corp.,* [1980] Fed.Sec.L.Rep. (CCH) ¶ 97,696 at 98,655 (1980). More colloquially put, if defendants' position were accepted, the possession of such "friends" as Reserve had would certainly obviate the need for enemies. We do not believe that such a Pyrrhic "benefit" to Reserve is sufficient to even trigger the *Cenco* analysis which seeks to determine the propriety of imputing to the corporation the directors' knowledge of fraud.

Even if a *Cenco*-type analysis were applied to the instant case, however, it would not yield the result that defendants urge, *i.e.,* estoppel of the Director based on the imputation to Reserve of the directors' knowledge of fraud. In *Cenco,* we undertook a two-pronged analysis to determine whether such imputation should occur: whether a judgment in favor of the plaintiff corporation would properly compensate the victims of the wrongdoing, and whether such recovery would deter future wrongdoing. *Cenco,* 686 F.2d at 455. We find that, if warranted by the proof at trial, recovery by the Director on behalf of Reserve would do both.

First, any recovery by the Director from the instant suit will inure to Reserve's estate. And under the distribution provisions of the governing liquidation statute, it is the policyholders and creditors who have first claim (after administrative costs and wages owed) to the assets of the estate. Ill.Rev.Stat., ch. 73, § 817 (1981). Thus, the claims of these entirely innocent parties must be satisfied in full before Reserve's shareholders, last in line for recovery, receive anything.

Moreover, there is no indication here that the Director's success entails the likelihood of the kind of "perverse" compensation pattern which we declined to permit in *Cenco*. In *Cenco,* the court was troubled first by the fact that among the shareholders benefiting from a successful recovery were the corrupt officers themselves, *Cenco,* 686 F.2d at 455; here, the defendants do not claim that the wrongdoing officers or directors hold equity positions in Reserve entitling them to recover from the instant suit. We

---

**4.** These defendants argue that, since Reserve was a wholly-owned subsidiary of ARC, the owners of Reserve, i.e. ARC shareholders, automatically benefited from the direct draining of Reserve and the fraudulent prolongation of Reserve's life. This argument founders on both logic and fact. First, it defies common sense to suggest that a parent corporation's shareholders are not injured when their directors fraudulently prop up, drain, and thereby deepen the insolvency of a subsidiary for whose liabilities the shareholders will eventually be liable. The damage resulting to the parent corporation's shareholders is as real as if the management

had impaired a valuable working asset or sold it for a meager sum far less than its present value. Second, as a factual matter, the complaint alleges that not all of the proceeds resulting from the crippling of Reserve redounded to the benefit of ARC and ARC's shareholders. According to the allegations, as a result of the SCOR agreements, ARC was secretly exposed to increased liability for GRC's performance; also as part of these agreements, SCOR allegedly received additional payments from ARC in excess of $2,500,000 for its assistance in furthering the scheme.

were also troubled in *Cenco* by the prospect of double recovery by the shareholders via the plaintiff corporation in view of the *previous* successful recovery of damages by these same shareholders in a direct suit against the defendants. In this case, by contrast, the other actions noted to this court based on these alleged events have yet to result in any recovery. Of course, if the Director recovers successfully in the instant suit, the defendants in these actions will be able to assert the previous satisfaction of the claims of the shareholders, policyholders, and creditors of Reserve as a bar to subsequent recovery.

Second, from the standpoint of deterrence, this court in *Cenco* based its refusal to permit the plaintiff to recover unimpeded by the directors' knowledge in large part on two circumstances not present here: 1) that the directors, as shareholders, would recover directly from the suit, and 2) that there existed large corporate shareholders in a position to police the plaintiff's corrupt officers, an activity that would be discouraged by allowing the shifting of corruption-caused loss to outside defendants. *Cenco,* 686 F.2d at 456. By contrast, here, as noted earlier, there is no evidence that the wrongdoing officers of Reserve would benefit directly from the instant suit. There is also no evidence here of the existence of large corporate shareholders capable of conducting an independent audit, as in *Cenco,* and whose lack of investigatory zeal would be rewarded by a decision favorable to the Director.

The court in *Cenco* also expressed reluctance to permit even innocent, atomized shareholders to recover damages for wrongdoing in which their officers were implicated, but that concern must be viewed against the background of the recovery of many of those same shareholders in an earlier action, and the fact that, suing directly, the full recovery in the later suit would inure to them. Significantly, due to the operation of the liquidation statute here, Reserve's shareholders are last in line for recovery from Reserve's estate and will receive only a residual recovery from the instant suit, if successful after trial, after all of the policyholders and creditors are compensated in full. Thus, unlike the situation in *Cenco,* permitting recovery in this case would not send unqualified signals to shareholders that they need not be alert to managerial fraud since they may later recover full indemnification for that fraud from third party participants.[5] In sum, we believe not only that *Cenco* is not applicable to the present case, but also that even if it were, application of its compensation and deterrent principles would not inhibit the right of the Director to proceed against the defendants here.

We turn finally to SCOR and SCOR Re's fallback argument that, even if the Director were not barred from proceeding under *Cenco,* the Director still lacks standing to sue on behalf of Reserve. Citing *Bergeson v. Life Insurance Corp.,* 265 F.2d 227 (10th Cir.1959), *cert. denied,* 360 U.S. 932, 79 S.Ct. 1452, 3 L.Ed.2d 1545 (1959); *Kinter v. Connolly,* 233 Pa. 5, 81 A.2d 905 (1911); *Patter-*

---

**5.** The defendants have argued that, due to the statutory authorization of treble damages in RICO civil actions, Reserve's shareholders will experience an enormous windfall recovery to the extent of the full damage increment exceeding single damages. This is not necessarily the case, however, for under the controlling statute, the shareholders will receive only the last residual of Reserve's *estate,* not a share of each recovery before it is added to that estate. As noted, there are other prior claims on that estate which must be satisfied first, including wages, administration costs, and the claims of policyholders and creditors which may well exceed the amount, or even triple the amount, asserted to have arisen from the damages to the corporation claimed in the present action.

Without knowledge of the size of each of these prior claims, evidence of which has not been presented at this stage, we decline to speculate on the existence or relative size of any recovery to Reserve's shareholders.

Moreover, since the deterrence policy of *Cenco* is a forward-looking one, we should apply it with the normal case in mind and not be overly swayed by the fortuity of a treble damage provision which may in some cases result in a large recovery to a plaintiff's shareholders. This is especially so where to hold otherwise, as here, would do immense damage to the policy underlying the statutory liquidation process: the protection of the interests of policyholders, shareholders and creditors jointly by the Director.

son v. Franklin, 176 Pa. 612, 35 A. 205 (1896); Kelly v. Overseas Investors, Inc., 18 N.Y.2d 622, 219 N.E.2d 288, 272 N.Y.S.2d 773 (1966); and Cotten v. Republic National Bank, 395 S.W.2d 930 (Tex.Civ.App.1965), these defendants argue that a corporation may never sue to recover damages alleged to have resulted from the artificial prolongation of an insolvent corporation's life. Next, they argue, since Count II and Count IV of the instant complaint assert that "Reserve continued to write insurance" as a result of the underlying mail fraud, and "Reserve's assets were dissipated notwithstanding that Reserve was at all times insolvent," the sole thrust of the Director's complaint is that the damages to Reserve occurred only because Reserve continued to do business past its point of insolvency. Therefore, they conclude, the Director's claim in this case is barred by the general rule prohibiting a corporation from suing for damages caused by the artificial prolongation of its life.

We reject both premises of this argument. First, in the underlying allegations here, the Director charges that the damage to Reserve stemmed not only from the mere extension of the normal business operation of Reserve, but from specific actions crippling Reserve which were taken as an integral part of that extension. Inter alia, the Director alleges that with the smoke-screen of the underlying mail fraud, Reserve's directors and other defendants were able to drain Reserve of over $3,000,000 of income, and to drain Reserve of its most profitable and least risky business, thereby deepening Reserve's insolvency. Thus, the "asset dissipation" alleged was not only that which resulted from the normal operation of the business, as in the cases cited by the defendants,[6] but also that which resulted from the bleeding of Reserve which was a part of the underlying scheme to defraud.

Alternatively, to the extent that the cited cases suggest that a corporation may not sue to recover damages resulting from the fraudulent prolongation of its life past insolvency, we decline to speculate that the

Illinois courts would accept this restriction on the Director's freedom of action. For each of these cases rests upon a seriously flawed assumption, i.e., that the fraudulent prolongation of a corporation's life beyond insolvency is automatically to be considered a benefit to the corporation's interests. See, e.g., Bergeson, 265 F.2d at 232; Kinter, 81 A. at 905; Patterson, 35 A. at 206. This premise collides with common sense, for the corporate body is ineluctably damaged by the deepening of its insolvency, through increased exposure to creditor liability. See In Re Investor's Funding Corp., [1980] Fed. Sec.L.Rep. (CCH) ¶ 97,696, at 98,655 (S.D.N.Y.1980). Indeed, in most cases, it would be crucial that the insolvency of the corporation be disclosed, so that shareholders may exercise their right to dissolve the corporation in order to cut their losses. See Ill. Rev.Stat., ch. 32, §§ 157.75, 157.76 (1981). Thus, acceptance of a rule which would bar a corporation from recovering damages due to the hiding of information concerning its insolvency would create perverse incentives for wrong-doing officers and directors to conceal the true financial condition of the corporation from the corporate body as long as possible. We are not prepared to conclude that the Illinois courts would adopt such a regime.

### III. The Applicability of RICO

We turn now to defendants' contentions that the injury to Reserve which the Director alleges is not compensable under RICO. The civil damage provision of RICO, 18 U.S.C. § 1964(c), creates a private right of action with treble damage recovery for "[a]ny person injured in his business or property by reason of a violation of [§ 1962]." Section 1962 enumerates two violations relevant to the instant case: § 1962(a) makes it "unlawful for any person who has received any income derived, directly or indirectly, from a pattern of racketeering activity . . . to use or invest, directly or indirectly, any part of such income, or the proceeds of such income, in

---

**6.** In Kinter v. Connolly, 233 Pa. 5, 81 A. 905 (1911), for example, the lower court noted specifically that in "the bill before us . . . there is

no averment that any act or omission of the defendants . . . caused loss or injury to the company." 81 A. at 905.

acquisition of any interest in, or establishment or operation of, any enterprise" which touches interstate commerce; and § 1962(c) makes it "unlawful for any person employed by or associated with any enterprise [engaged in interstate commerce] to conduct or participate directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity. . . ." Finally, RICO § 1961 defines a "pattern of racketeering activity" as at least two occurrences within ten years of any of several predicate offenses, including mail fraud.

In his complaint, the Director alleges that injury to Reserve stemmed from the violation by the defendants of both § 1962(a) and § 1962(c). The underlying "pattern of racketeering activity" alleged consists of the mail fraud which occurred in connection with the mailing of the fraudulent financial statements of Reserve which all defendants knew did not disclose Reserve's insolvency or the purpose and effects of the SCOR deal. Count II of the complaint alleges that the officers and directors, SCOR and SCOR Re used income derived from the pattern of racketeering activity in the operation of their businesses in violation of § 1962(a), and that the same defendants conducted the affairs of ARC, SCOR, and SCOR Re through the underlying pattern of racketeering activity, in violation of § 1962(c). Count IV alleges that the officers and directors and the three defendant accounting firms used income derived from the racketeering activity in the operation of ARC and the accounting firms in violation of § 1962(a), and that the officers and directors and the accounting firms conducted the affairs of ARC and the accounting firms through a pattern of racketeering activity in violation of § 1962(c).

Because each of the described violations amount to alternative characterizations of the same conduct, *i.e.*, the cooperation of the defendants in a scheme which impaired Reserve, we can find that RICO applies if any one of the Director's theories is sufficient to invoke the statute. Indeed, we find, after careful consideration, an adequate description of a compensable civil RICO claim in the portions of Counts II and IV of the complaint which allege injury to Reserve as a result of the defendants' direct or indirect participation in the conduct of ARC's affairs through the alleged mail fraud in such a manner as to artificially prolong Reserve's existence and worsen its insolvency and losses.

The defendants contend that numerous fatal defects inhere in these portions of the Director's complaint. First, they argue that the complaint itself is technically insufficient on its face by failing to explicitly allege that all of the defendants participated in the conduct of ARC and by failing to allege that Reserve's injury occurred as a result of the *operation of ARC* through the underlying mail fraud. Second, and more generally, they argue that Congress did not intend that the civil provisions of RICO would be applicable to the general universe of business fraud encompassing the acts alleged here. Third, the defendants argue that the proper causational predicates for the invocation of § 1964(c) are not present here; recovery, they aver, may only follow a showing that the plaintiff suffered "competitive" rather than "direct" injury from the defendants' actions, and, in any case, they maintain, there is a failure to allege that *any* injury to Reserve stemmed from the operation of ARC through the mail fraud. Finally, the accounting firm defendants, SCOR and SCOR Re argue several miscellaneous theoretical insufficiencies in the Director's complaint: no recovery is possible by Reserve, the "perpetrator" of the fraud, against Reserve's "unwitting tools," under our decision in *Cenco, Inc. v. Seidman & Seidman*, 686 F.2d 449 (7th Cir. 1982); the accountants, SCOR and SCOR Re were not sufficiently "employed by or associated with" ARC; and SCOR and SCOR Re could not have been culpable of the alleged underlying mail fraud. We shall consider each of these arguments *seriatim*.

### A. *Technical Sufficiency of the Complaint*

The defendants first insist that, even were the theoretical hurdles to RICO cover-

age cleared, the Director's complaint does not recite coherently an underlying violation of § 1962(c) or injury stemming therefrom. We find that these arguable technical insufficiencies inhere only in the cumulative and summary portions of the complaint, and that the Director's basic theory is supported by the complaint's full factual allegations. In examining the complaint, we are guided by the principle that the "liberal pleading policy of the [Federal Rules of Civil Procedure] prevents dismissal of a meritorious action for purely formal or technical reasons," *Murphy v. White Hen Pantry Co.*, 691 F.2d 350, 353 (7th Cir.1982), and that we are to construe the pleadings in the plaintiff's favor, *Schnell v. City of Chicago*, 407 F.2d 1084, 1086 (7th Cir.1969).[7] Moreover, this court may grant leave to amend the complaint to correct even substantive errors in the pleadings where this would facilitate a decision on the merits and no prejudice would ensue to the defendants. 3 J. Moore, Moore's Fed. Practice ¶¶ 15.08, 15.10 (2d ed.1976); Wright and Miller, Federal Practice and Procedure, §§ 1474, 1487 (1977).

The first arguable technical deficiency in the complaint concerns the statements in paragraphs 81 and 98 that Reserve was damaged "[a]s a direct result of the intentional scheme to defraud, the use of the United States mails in its furtherance and the above described pattern of racketeering activity...." This statement, defendants argue, fails to meet the requirement that RICO damages must be alleged to have occurred "by reason of" the *conduct* of an *enterprise* through a pattern of racketeering activity, not by reason of the underlying racketeering activity itself. But a natural, let alone liberal, reading of the complaint reveals it to be in full conformance with RICO's requirements. For the "intentional scheme to defraud" (the source of the injury) is defined at paragraphs 73 and 90 precisely as the above "conspiracy" set forth in the extensive prefatory factual allegations; that "conspiracy" describes precisely those aspects of the *operation* of ARC and Reserve's affairs made possible "through" the SCOR agreement and the cover-up of Reserve's insolvency. Indeed, it is ARC's operation in such a manner as to artificially prolong the operation of Reserve, not the mail fraud itself, which is separately underscored by the Director as the gravamen of the complaint. *See* paragraphs 41, 43, 44, 57 (realleged at ¶ 72 (Count II) and ¶ 89 (Count IV)). Thus, we find that the causal nexus as alleged easily satisfies the requirements of § 1964(c). However, to clarify the complaint and eliminate any possible misunderstanding, the district court may grant leave to amend the complaint to meet the problems discussed above.

■ The second technical deficiency in the complaint is the phrasing of the para-

---

7. The defendants argue that there is no place in the instant appeal for application of the liberal pleading policy embodied in *Murphy v. White Hen Pantry Co.* and *Conley v. Gibson,* 355 U.S. 41, 78 S.Ct. 99, 2 L.Ed.2d 80 (1955), because the basic question to be decided here concerns the alleged absence of federal jurisdiction, and not a 12(b)(6)—related challenge to the sufficiency of the complaint. However, the liberal construction policy of Fed.R.Civ.P. 8(f) is not limited to the context of 12(b)(6) motions. Moreover, although this case is not formally an appeal of denial of a 12(b)(6) motion, the defendants' assault on the technical adequacy of the complaint raises the identical issue involved in such an appeal; we therefore find it appropriate to seek guidance from precedents addressing that procedure.

The defendants argue that liberal construction and amendment of the Director's complaint is especially inappropriate here because the latter was admonished in proceedings below to make sure that its pleadings were sufficient before the appeal was certified. The Director declined to do so, but only in the face of statements by some of the defendants that they would object to such an attempt to amend the complaint, and that, in any case, their primary challenge to the Director's complaint was that no set of facts describing the alleged events, however arranged, could support the invocation of RICO. We also take note of the extraordinary conceptual disarray and schism even among district courts in this circuit, discussed *infra,* as to the proper elements of a RICO pleading. Under these circumstances, we decline to penalize the Director for failing to state the summary portions of his RICO allegation with technical precision, especially where his preceding factual allegations amply support on their face a proper RICO claim.

graphs in Count II and Count IV charging a violation of § 1962(c):

> The officers and directors, SCOR, SCOR Reinsurance ... [Anderson, Coopers and Grant] conducted the affairs of ARC, SCOR, SCOR Reinsurance ... [Anderson, Coopers and Grant] *respectively,* through the pattern of racketeering activity ... in violation of 18 U.S.C. § 1962(c). (emphasis added).

While it is true that these cumulative paragraphs, taken in themselves, state that only the *officers and directors* conducted the affairs of ARC, there are ample factual allegations, realleged in Counts II and IV, describing the participation of SCOR, SCOR Re and the accountant defendants in the conduct of ARC. *See* paragraphs 29, 30, 33, 34, 37, 42, 44, 49, 49.1, 52, 53, 54. Whether these allegations are sufficient to allege a RICO violation as a policy matter is discussed *infra,* but here we note only that a reading of the full face of the complaint, rather than just the technically insufficient cumulative paragraph, discloses that the Director has alleged conduct which will at least arguably satisfy § 1962(c). Since it therefore does not appear "beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief," *Conley v. Gibson,* 355 U.S. 41, 45–46, 78 S.Ct. 99, 101–102, 2 L.Ed.2d 80 (1957) (footnote omitted), we cannot dismiss the complaint on the basis of this deficiency. However, to help clarify the complaint, the district court may grant leave to amend paragraphs 79 and 96 in Counts II and IV to specify the participation of *all* of the defendants in the conduct of ARC's affairs, in conformance with the numerous preceding allegations.[8]

### B. *The Application of RICO to Business Fraud*

The defendants' main line of attack upon the Director's complaint is that, while it alleges conduct to which RICO might literally apply, Congress did not intend that the

statute would reach so far. To allow the Director's complaint to proceed, they argue, would be to unreasonably federalize the common law of "garden variety" business fraud, and eclipse the federal securities laws, providing treble damage actions for all securities-related mail fraud. We agree that the civil sanctions provided under RICO are dramatic, and will have a vast impact upon the federal-state division of substantive responsibility for redressing illegal conduct, but, like most courts who have considered this issue, we believe that such dramatic consequences are necessary incidents of the deliberately broad swath Congress chose to cut in order to reach the evil it sought; we are therefore without authority to restrict the application of the statute. *United States v. Turkette,* 452 U.S. 576, 587, 101 S.Ct. 2524, 2531, 69 L.Ed.2d 246 (1981); *United States v. Aleman,* 609 F.2d 298, 303–04 (7th Cir.1979); *Bennett v. Berg,* 685 F.2d 1053, 1064 (8th Cir.1982), *pet. for reh. en banc granted,* Sept. 17, 1982.

We begin our analysis with the plain language of the statute, which provides that "any person" may be liable for a violation of § 1962(c). "Person" is defined at § 1961(3) as "any individual or entity capable of holding a legal or beneficial interest in property...." It does not appear that any of the defendants seriously argue that we should impose a further gloss on that definition requiring that the "person" be affiliated with "organized crime." Such an argument would, of course, be unavailing in light of the clear decisions of this and other courts that application of § 1962(c) "is not restricted to members of organized crime." *Cenco, Inc. v. Seidman & Seidman,* 686 F.2d 449, 557 (7th Cir.1982); *United States v. Aleman,* 609 F.2d 298, 303 (7th Cir.1979); *Bennett v. Berg,* 685 F.2d 1053, 1063 (8th Cir.1982), *pet. for reh. en banc granted,* Sept. 17, 1982; *Hanna v. Norcen Energy Resources Ltd.* [Current] Fed.Sec.L.Rep.

---

**8.** Not only did the existence of these numerous paragraphs detailing the defendants' participation in ARC's affairs give notice to the defendants of the Director's § 1962 theory, but also any arguable prejudice resulting from an amendment would be minimal in view of the preliminary status of the case at present. Wright and Miller, Federal Practice and Procedure, § 1487 (1971).

(CCH) ¶ 98,742 at 93,738 (N.D.Ohio 1982); *Lode v. Leonardo,* 557 F.Supp. 675 (N.D.Ill. 1982); *D'Iorio v. Adonizio,* C.A., 554 F.Supp. 222 (M.D.Pa.1982); *Hellenic Lines, Ltd. v. O'Hearn,* 523 F.Supp. 244, 247 (S.D. N.Y.1981); *Engl v. Berg,* 511 F.Supp. 1146, 1155 (E.D.Pa.1981); *Parnes v. Heinold Commodities,* 487 F.Supp. 645, 646 (N.D.Ill. 1980); *United States v. Gibson,* 486 F.Supp. 1230, 1240–41 (S.D.Ohio 1980); *United States v. Chovanec,* 467 F.Supp. 41, 44–45 (S.D.N.Y.1979). *See also* Strafer, Massumi & Skolnick, *Civil RICO in the Public Interest: "Everybody's Darling,"* 19 Am.Crim.L. Rev. 655, 665–88 (1982). Note, *Civil RICO: The Temptation and Impropriety of Judicial Restriction,* 95 Harv.L.Rev. 1101, 1106–09 (1982); Comment, *Reading the "Enterprise" Element Back into RICO Sections 1962 and 1964(c),* 76 N.W.U.L.Rev. 100, 100–01 & n. 4 (1982). *But see Moss v. Morgan Stanley, Inc.,* [Current] Fed.Sec.L.Rep. (CCH) ¶ 99,045 at 94,982 (S.D.N.Y.1983); *Wagner v. Bear, Stearns and Co., Inc.,* [Current] Fed.Sec.L.Rep. (CCH) ¶ 99,032 at 94,-913 (N.D.Ill.1982); *Adair v. Hunt International Resources Corp.,* 526 F.Supp. 736, 746–48 (N.D.Ill.1981); *Waterman Steamship Corp. v. Avondale Shipyards, Inc.,* 527 F.Supp. 256, 260 (E.D.La.1981); *Barr v. WUI/TAS, Inc.,* 66 F.R.D. 109, 113 (S.D.N. Y.1975). Nonetheless, defendants argue, the use of civil RICO suits against business fraud, such as that alleged here, would duplicate existing state law and federal securities law remedies, would not further the purposes of the Act, and was not within the contemplation of Congress.

The chief problem with this argument is that Congress was well aware of the range of application authorized by RICO's capacious statutory language.[9] But Congress was equally adamant that the fight against organized criminal social exploitation not be impeded by an overly narrow definition of actionable conduct.[10] Congressman Poff, a sponsor of the bill, defended the broad reach of the act by noting,

> The curious objection has been raised to [RICO's provisions] that that they are not somehow limited to organized crime—as if organized crime were a precise and operative legal concept, like murder, rape or robbery. Actually, of course, it is a functional concept like white-collar or street crime serving simply as a short-hand method of referring to a large and varying group of individual criminal offenses committed in diverse circumstances.[11]

And as Senator McClellan conceded, "Of course, it is true that Title X will have some application to individuals who are not themselves members of La Cosa Nostra or otherwise engaged in organized crime. However, that is not a reason to cut back its scope. . . ."[12] Later, he noted that "the Senate report does not claim . . . that the listed offenses are committed *primarily* by members of organized crime, only that these offenses are characteristic of organized crime."[13] In short, Congress chose to provide civil remedies for an enormous variety of conduct, balancing the need to redress a broad social ill against the virtues of

---

**9.** As Representative Mikva noted in House debate,

> My objection to the bill in toto is that whatever its motives to begin with, we will end up with cases involving all kinds of things not intended to be covered, and a potpourri of language by which you can parade all kinds of horribles of overreach . . . under the definition if five or more of [my colleagues] engage in . . . a game of poker and it lasts past midnight . . . thus continuing for a period of two days, then [they] have been running an organized gambling business and [they] can get 20 years, and the Federal Government can grab off the pot besides.

116 Cong.Rec. at 35,204 (1970).
Similar objections were voiced by civil liberties groups, fearing overbroad application. *See*

Measures Relating to Organized Crime: Hearings on S. 30, S. 974, S. 975, S. 976, S. 1623, S. 1624, S. 1861, S. 2022, S. 2122 and S. 2292, before the Subcommittee on Criminal Laws and Procedure of the Senate Committee on the Judiciary, 91st Cong., 1st Sess. at 475 (1969).

**10.** *See, e.g.,* 116 Cong.Rec. 601 (1970) (statement by Sen. Hruska, outlining problem in demonstrating connections between abhorred activity and formal criminal syndicates).

**11.** 116 Cong.Rec. at 35,344.

**12.** 116 Cong.Rec. at 18,945 (1970).

**13.** McClellan, *The Organized Crime Act or Its Critics: Which Threatens Civil Liberties?,* 46 Notre Dame Law Rev. 55, 142 (1970).

tight, but possibly overly astringent, legislative draftsmanship. It is not for this court to reassess the balance struck.

That deference to the conscious assessment of Congress should be our guiding principle is made especially clear upon examination of the defendants' specific objection that our reading of RICO will unreasonably eclipse existing federal civil remedies for securities law violations by providing a treble damage action where two acts of mail fraud accompany the disputed sale or purchase of securities. Defendants' contention proves too much, for such a result is to a degree *explicitly* accomplished, even without the simultaneous presence of mail fraud, by the designation in § 1961 of "fraud in the sale of securities" as a predicate offense giving rise to a civil damage action where an enterprise is operated through such fraud; clearly, such an outcome is not the result of a strained interpretation of RICO, but rather is explicitly mandated. Defendants' objection that our interpretation will unreasonably bring into the federal ambit regulation of common law fraud likewise proves too much, for such a realignment of the federal-state role has already been accomplished in the criminal sphere through the existence of the mail fraud statute itself. Moreover, the defendants, in raising the spectre of the opening of the litigation floodgates, overlook the fact that neither common law fraud nor securities law violates will, by themselves, be automatically eligible for redress through a civil RICO action; there is the additional requirement under § 1964(c), discussed *infra,* that an interstate enterprise be conducted "through" a pattern of such activity.

In sum, defendants' profession of alarm at the expansion of federal jurisdiction over business fraud through RICO amounts to nothing less than a dispute with the very design, and not the mere application, of the statute. As the Supreme Court has noted in the criminal context,

> [T]he language of the statute and its legislative history indicate that Congress was well aware that it was entering a new domain of federal involvement through the enactment of this measure.

Indeed, the very purpose of the Organized Crime Control Act of 1970 was to enable the Federal Government to address a large and seemingly neglected problem. The view was that existing law, state and federal, was not adequate to address the problem, which was of national dimensions. That Congress included within the definition of racketeering activities a number of state crimes strongly indicates that RICO criminalized conduct that was also criminal under state law, at least when the requisite elements of a RICO offense are present. As the hearings and legislative debates reveal, Congress was well aware of the fear that RICO would "mov[e] large substantive areas formerly totally within the police power of the State into the Federal realm." [citations omitted] . . . In the face of these objections, Congress nonetheless proceeded to enact the measure, knowing that it would alter somewhat the role of the Federal Government in the war against organized crime and that the alteration would entail prosecutions involving acts of racketeering that are also crimes under state law. There is no argument that Congress acted beyond its power in so doing. That being the case, the courts are without authority to restrict the application of the statute.

*United States v. Turkette,* 452 U.S. at 586, 587, 101 S.Ct. at 2531 (1981).

In view of this legislative history, it is not surprising that most courts in this and other circuits have had little trouble in entertaining RICO civil actions for damages flowing from the operation by otherwise "legitimate" business people of enterprises through a pattern of mail fraud and securities law violations. *See, e.g., Bennett v. Berg,* 685 F.2d 1053 (8th Cir.1982), *pet. for reh. en banc granted,* Sept. 17, 1982 (upholding finding that defendant mortgage lender, insurance company, developer, accountants, attorneys and corporate directors caused compensable RICO damages through operation of retirement community through, *inter alia,* mail fraud); *USACO Coal Co. v. Carbomin Energy, Inc.,* 689 F.2d 94 (6th Cir.1982) (upholding injunction in

civil RICO action founded on corporate promoter's breach of fiduciary duty); *Parnes v. Heinold Commodities, Inc.*, 487 F.Supp. 645 (N.D.Ill.1980) (RICO action stemming from mail fraud in commodities trading); *Heinold Commodities, Inc. v. McCarty*, 513 F.Supp. 311 (N.D.Ill.1979) (commodities fraud); *Hanna v. Norcen Energy Resources, Ltd.*, [Current] Fed.Sec.L.Rep. (CCH) ¶ 98,742 (N.D.Ohio 1982) (RICO action against corporation and its investment banking firm upheld); *Engl v. Berg*, 511 F.Supp. 1146 (E.D.Pa.1981) (upholding action against mortgage company in securities fraud RICO claim); *Spencer Companies v. Agency Rent-A-Car, Inc.*, [1981] Fed.Sec.L. Rep. (CCH) ¶ 98,361 (D.Mass.1981) (alleged fraud in misleading public statement in corporate takeover actionable under RICO); *Computer Terminal Systems, Inc. v. Gross*, 1982–1 Trade Cas. (CCH) ¶ 64,531 (E.D.N.Y. 1981) (action against company officers involving kickback scheme). *But see Wagner v. Bear, Stearns and Co., Inc.*, [Current] Fed.Sec.L.Rep. (CCH) ¶ 94,032 at 94,913 (N.D.Ill.1982); *Moss v. Morgan Stanley, Inc.*, [Current] Fed.Sec.L.Rep. (CCH) ¶ 99,-045 at 94,982 (S.D.N.Y.1983); *Adair v. Hunt International Resources Corp.*, 526 F.Supp. 736 (N.D.Ill.1981); *Waterman Steamship Corp. v. Avondale Shipyards, Inc.*, 527 F.Supp. 256 (E.D.La.1981); *Barr v. WUI/TAS, Inc.*, 66 F.R.D. 109 (S.D.N.Y. 1975).

Another major problem with the sort of judicial pruning of RICO's civil provisions, advocated by defendants, where business fraud is alleged is that there is simply no legitimate principled criterion through which to accomplish this distinction. Presumably, the infiltration of a corporation by an organized crime syndicate and the subsequent commission of fraud which results in the looting of the corporation's assets for the syndicate's benefit would and should form the basis for a legitimate RICO action. But the only way in which to distinguish this case from the commission of "garden variety" fraud by "legitimate" corporate directors and outside corporations and auditors, as here alleged, is the presence of an "organized crime" nexus in the first case. Indeed, most courts have squarely exempt-

ed "normal" business or securities fraud-related claims from RICO's coverage have been forced to rely on the already discredited "organized crime" limitation. *See, e.g., Wagner v. Bear Stearns and Co., Inc.*, [Current] Fed.Sec.L.Rep. (CCH) ¶ 94,032 at 94,-913 (N.D.Ill.1982); *Moss v. Morgan Stanley, Inc.*, [Current] Fed.Sec.L.Rep. (CCH) ¶ 99,-045 at 94,982–43; *Adair v. Hunt International Resources Corp.*, 526 F.Supp. 736, 747 (N.D.Ill.1981); *Waterman Steamship Corp. v. Avondale Shipyards, Inc.*, 527 F.Supp. 256, 259 (E.D.La.1981); *Barr v. WUI/TAS, Inc.*, 66 F.R.D. 109, 112–13 (S.D.N.Y.1975). Obviously, having already rejected the "organized crime" limitation, *United States v. Aleman*, 609 F.2d at 303; *Cenco, Inc.*, 686 F.2d at 557, this court does not wish that limitation to be revived under the guise of determining the kinds of activity covered by RICO.

In short, while we are mindful of the jurisprudential maxim that statutes are not to be interpreted woodenly and without regard to their aim, we do not see how any legitimate or principled tailoring of RICO could be effected without impairing the broad strategy embodied in the act. If Congress wishes to avoid the inclusion under RICO's umbrella of "garden variety" fraud claims involving the operation of enterprises through mail and securities fraud, it may easily do so through removing mail and securities fraud from the list of predicate acts enumerated in § 1961. That is not, however, a program which may be undertaken by this court. *United States v. Turkette*, 452 U.S. 576, 586–87, 101 S.Ct. 2524, 2530–31, 69 L.Ed.2d 246 (1981).

### C. *The Requirement of "Competitive" or "Indirect" Injury*

The defendants' next line of attack on the Director's complaint recites that the allegations point to no "competitive injury" to Reserve from the operation of ARC. Citing Congress' concern with the impact of organized crime infiltration upon free competition and the structural similarity of the RICO treble damage provisions to those available under the antitrust laws, the defendants argue that the civil remedy pro-

vided in § 1964 to "[a]ny person injured in his business or property" is not available to those who have suffered *directly* through the operation of a business through a pattern of racketeering, but only to those injured as competitors. Since Reserve is not a competitor of ARC, defendants conclude, the former may not invoke § 1964(c).

We note at the outset that the defendants' construction has been accepted by some district courts. *See North Barrington Development, Inc. v. Fanslow,* 547 F.Supp. 207 (N.D.Ill.1980); *Van Schaick v. Church of Scientology of California, Inc.,* 535 F.Supp. 1125 (D.Mass.1982); *Erlbaum v. Erlbaum* [Current] Fed.Sec.L.Rep. ¶ 98,772 at 93,922–23 (E.D.Pa.1982); *Landmark Savings and Loan v. Rhoades,* 527 F.Supp. 206 (E.D.Mich.1981). But it has been rejected by the greater number of courts and commentators. *See, e.g., Bennett v. Berg,* 685 F.2d at 1059, *pet. for reh. en banc granted,* Sept. 17, 1982; *D'Iorio v. Adonizio,* C.A., 554 F.Supp. 222 (M.D.Pa.1982); *Prudential Lines, Inc. v. McKeon,* No. 80 Civ. 5853 (S.D.N.Y. April 21, 1982); *Parnes v. Heinold Commodities, Inc.,* 487 F.Supp. 645 (N.D.Ill.1980); *Heinold Commodities v. McCarty,* 513 F.Supp. 311, 313 (N.D.Ill. 1979); *Hanna Mining Co. v. Norcen Energy Resources, Ltd.,* [Current] Fed.Sec.L.Rep. (CCH) ¶ 98,742 at 93,737 (N.D.Ohio 1982); *Engl v. Berg,* 511 F.Supp. 1146 (E.D.Pa. 1981); *Hellenic Lines, Inc. v. O'Hearn,* 523 F.Supp. 244, 248 (S.D.N.Y.1981) ("RICO does not countenance racketeering activity so long as it is done uniformly across competing concerns"); *Spencer Companies, Inc. v. Agency Rent-a-Car, Inc.,* [1981] F.Sec.L. Rep. (CCH) ¶ 98,361 (D.Mass.1981); Strafer, Massumi & Skolnick, *Civil RICO in the Public Interest, supra,* at 689–707; Blakely and Gettings, *Racketeer Influenced and Corrupt Organizations (RICO): Basic Concepts— Civil and Criminal Remedies,* 53 Temple L.Q. 1009, 1040–43 (1983); Note, *Civil RICO: The Temptation and Impropriety of*

*Judicial Restriction, supra,* at 1109–1114; *But see* Comment, *Reading the "Enterprise" Element Back into RICO, supra,* at 125–26 (1981). And, we think, rightly so, for such a crabbed interpretation as the defendants offer does not fully credit Congressional intent or fulfill the purposes of RICO.

First, while in enacting RICO Congress expressed its concern that organized crime "interfere[s] with free enterprise," and noted its desire to protect those injured competitively by businesses infused with the gains of racketeering,[14] it also indicated its concern that "organized crime activities in the United States weaken the stability of the Nation's economic system, *harm innocent investors* and competing organizations . . . and undermine the general welfare of the Nation and its citizens." [15] (emphasis added). Rejecting an alternative legislative course which would have involved simply amending the antitrust laws to provide remedies for competitive harm caused by racketeering infiltration,[16] Congress instead enacted RICO as a separate tool in the fight against organized crime. As noted by the Antitrust Section of the American Bar Association in committee hearings on RICO, the latter course possessed precisely the advantage of allowing for the effectuation of purposes beyond the protection of competition:

> [Some] activities of organized crime in legitimate business may or may not be subject to the antitrust laws. Thus, some extortion tactics and business takeovers by organized crime might not be reached under the antitrust laws, particularly if they affected only the victimized business rather than resulted in a lessening of competition in an entire line of commerce.[17]

In short, RICO was broadly aimed at "striking . . . a mortal blow against the property

---

**14.** OCCA Publ.L. No. 91–452, 84 Stat. 922, 923 (1970) (Statement of Findings and Purpose); 116 Cong.Rec. 602 (1970) (statement of Senator Hruska).

**15.** Publ.L. No. 91–452, Sec. 1(4), 84 Stat. 922 (1970).

**16.** S. 2048, 90th Cong., 1st Sess. (1967), extending the Sherman Act to coverage of organized criminal activity, was left dormant in committee.

**17.** 1969 Hearings, Note 6, *supra,* at 556, 557.

interests of organized crime." 116 Cong. Rec. 602 (1970) (statement of Senator Hruska). This court is reluctant to undermine that broad mission of RICO by engrafting onto its civil provisions a competitive injury requirement. *See Bennett v. Berg,* 685 F.2d at 1059 ("In a RICO context, there are few countervailing reasons to lessen the impact of RICO remedies by imputing the limitations on standing which apply to antitrust law.").

The structural similarity of the RICO civil damages apparatus to that contained in the antitrust laws does not persuade us otherwise. An examination of the relevant Congressional debate reveals that the references to antitrust law and precedent were attempts to justify the extraordinary treble damage action as a device to deter organized crime; the notion that the objectives of RICO and the Sherman Act were identical was discounted.[18] Moreover, to the extent that antitrust law and policy are increasingly concerned primarily with market efficiency rather than the deleterious effects of concentrated market power itself,[19] analogies to that body of law become increasingly irrelevant, since the exercise of social power by organized crime is thought to be *malum in se.*[20]

■ Finally, Congress' specific refusal to expand the Sherman Act to authorize RICO-type recoveries is not without significance. As the President of the American Bar Association noted in testifying on behalf of a separate RICO statute,

> [T]he use of the antitrust laws themselves as a vehicle for combating organized crime could create inappropriate and unnecessary obstacles in the way of persons injured by organized crime who might seek treble damage recovery. Such a private litigant would have to contend with a body of precedent—appropriate in a purely antitrust context—setting strict requirements on questions such as "standing to sue" and "proximate cause." [21]

In short, we believe, like most other courts, that the erection of a "competitive" or "indirect" injury barrier to RICO recovery comports with neither the plain language nor the central goal of the statute.

### D. *Injury "By Reason Of" A § 1962(c) Violation*

Defendants' next argument is that, even if a RICO plaintiff need not allege a "competitive injury," he must plead injury "by reason of" a § 1962(c) violation, *i.e.,* by reason of the *operation* of an enterprise through the underlying pattern of racketeering activity, not by reason of the predicate offense itself. And the Director's complaint, they argue, alleges no such injury from the operation of ARC but rather only from the underlying mail fraud. Further, defendants maintain that § 1964(c) requires that plaintiffs must allege injury caused indirectly by a racketeering enterprise separate from the plaintiff itself. While we believe this latter argument to be without merit in view of our determination in III C. *supra* that RICO was designed to protect *direct,* and not just second-order, victims of organized crime infiltration, we need not reach it here, for the Director's complaint, as construed in III A. *supra, does* allege an injury to Reserve by reason of the operation of a separate enterprise, ARC, through a pattern of racketeering activity. We also cannot accept the defendants' contention that the Director's complaint does not allege injury to Reserve by reason of the

---

18. Senator Hruska noted that the legislation "seeks to strengthen the defense of legitimate business takeover by organized crime" and disavowed antitrust standing parallels. *See* 115 Cong.Rec. 6992 (1969). Senator McClellan echoed this point later, noting, "There is . . . no intention here of importing the great complexity of antitrust law enforcement into this field . . . ." *Id.* at 9567.

19. *See, e.g., MCI Communications Corp. v. American Telephone and Telegraph Co.,* 708 F.2d 1081 at 1110, 1111 (7th Cir.1983).

20. *See* Note, *Civil RICO: The Temptation and Impropriety of Judicial Restriction, supra,* at 1113, 1114.

21. Organized Crime Control: Hearings on S. 30 Before the Subcommittee No. 5, House Committee on the Judiciary, 91st Cong., 20th Sess. at 149 (1969).

operation of ARC through the underlying fraud.

As noted in III A. *supra,* the whole thrust of the Director's complaint is that Reserve was a victim of the dishonest *operation* of *ARC* through a pattern of sham reinsurance, falsification of financial statements, and fraudulent dealings with state insurance regulators which allowed ARC to prolong Reserve's life beyond insolvency and thus exacerbate its financial woes. The Director does not allege that the predicate fraudulent acts were aimed directly at Reserve, as was the case with the plaintiffs in *Johnsen v. Rogers,* 551 F.Supp. 281 (C.D. Cal.1982); *Bays v. Hunter Savings Association,* 539 F.Supp. 1020, 1024 (S.D.Ohio 1982); *Harper v. New Japan Securities,* 545 F.Supp. 1002, 1007–08 (C.D.Cal.1982); and *Erlbaum v. Erlbaum,* [Current] Fed.Sec.L. Rep. (CCH) ¶ 98,722 (E.D.Pa.1982), cited by defendants.

Instead, the Director asserts that Reserve suffered from the defrauding of the State Department of Insurance which permitted ARC to cause Reserve to continue to operate beyond its insolvency and to allow Reserve to be further drained of its income and more favorable business. Thus, the Director's allegation suggests an even stronger example of damage incurred through the operation of an enterprise than was alleged and upheld in *Computer Terminal Systems, Inc. v. Gross,* 1982 Trade Cases (CCH) ¶ 64,532 (E.D.N.Y.1981), and *Hellenic Lines Ltd. v. O'Hearn,* 523 F.Supp. 244 (S.D. N.Y.1981), approvingly cited by defendants, in which the plaintiff corporations were damaged by a scheme of bribes and kickbacks conducted *through* the plaintiff corporation, thus entailing financial losses which stemmed directly from the commission of the predicate offenses.

The defendant directors argue alternatively that the "by reason of" requirement is not met by the Director in the present allegations because he fails to allege that Reserve suffered damage which it would not have suffered had Reserve become insolvent for reasons having nothing to do with the underlying fraudulent operations proscribed by RICO. We must reject this argument on behalf of such attenuated "but for" causation; it is the logical equivalent of proposing that a murderer may not be held liable for his victim's death since the state cannot demonstrate that the victim may not have perished eventually by accident. Equally fatuous is the suggestion of some of the defendants that they may not be held liable for damage arising from the fraudulent operation of ARC since Reserve's immediate injury stemmed from the Illinois Department of Insurance's assent to Reserve's continued operation. Such an argument plainly confuses cause with result, for the fraudulent operation of ARC was surely the alleged progenitor of Reserve's damage, regardless of whether the state regulatory authority was a necessary instrument in the accomplishment of that end.

█ In sum, we find that the complaint alleges a causal nexus between RICO-proscribed conduct and Reserve's damage sufficient to meet the requirements of § 1964(c).

### E.   *Miscellaneous Contentions*

The defendants cite several other defects in the theory of the Director's complaint. We find them also to be without merit, and discuss them briefly below.

Defendants first argue that our decision in *Cenco,* denying civil RICO standing to an accounting firm attempting to sue its client corporation for damages stemming from a fraud aided by the accounting firm, precludes the maintenance of the Director's standing in the instant case. In denying standing to the auditors in that case, we noted that it "is probably on behalf of the owners, perhaps also the customers and competitors, of such businesses that the [RICO] civil damages remedy was created, and not on behalf of the people who supply office equipment or financial or legal services to criminal enterprises that may be violating RICO." *Cenco,* 686 F.2d at 455. We therefore concluded that Congress did not intend to create a cause of action for "all who may have suffered *indirectly* from the violation, especially where many of them would inevitably be, as here, the wit-

ting or unwitting tools of the violator." *Id.* at 457 (emphasis added). Defendants seize on this latter phrase and argue that, if an action may be denied to an auditor who is a "witting or unwitting tool" of the violator, *a fortiori* a "violator" (*i.e.,* Reserve) may not sue its "unwitting tool" (*i.e.,* the accountant defendants). Such an argument must fail, for, unlike in *Cenco,* we have found here that the complaint alleges that Reserve was a *victim* of the RICO violation, not its perpetrator. *See* II, *supra,* at 8–9. Therefore, the Director, as the statutory "owner" of Reserve and the *direct* victim of the defendants' unlawful activity, is precisely the kind of plaintiff who must be given standing in order to fulfill the deterrent objectives of RICO. *Cenco,* 686 F.2d at 455.

Defendants SCOR and SCOR Re next argue that they were not "employed by or associated with" ARC and are therefore excluded from liability under § 1962(c). They argue that § 1962(c) in essence requires that a defendant must be an "insider" or "manager" of the damage-causing enterprise in order to suffer liability. We do not believe that the language and purpose of § 1962(c) supports such an interpretation.

As this court has noted before, in finding that a non-manager defendant arsonist met the § 1962(c) requirement, "The nature of racketeering connections to an otherwise legitimate business suggests that elements outside a company may assist in obtaining the company's illegal goals. Thus, '[t]he substantive proscriptions of the RICO statute apply to insiders *and outsiders*—those merely "associated with" an enterprise— who participate directly *and indirectly* in the enterprise's affairs through a pattern of racketeering activity. [Citations omitted]. Thus, the RICO net is woven tightly to trap even the smallest fish, those peripherally involved with the enterprise.'" *United States v. Starnes,* 644 F.2d 673, 679 (7th Cir.1981), *quoting United States v. Elliott,*

571 F.2d 880, 903 (5th Cir.1978), *cert. denied, sub nom. Delph v. United States,* 439 U.S. 953, 99 S.Ct. 349, 58 L.Ed.2d 344 (1978) (emphasis in the original).[22] Other courts as well have had little trouble in finding that defendants who are not managers or employees in the colloquial sense are nevertheless reached by § 1962(c). *See Bennett v. Berg,* 685 F.2d 1053 (8th Cir.1982), *pet. for reh. en banc granted, Sept. 17, 1982* (upholding liability against mortgage lender, attorneys, accountants of enterprise); *United States v. Bright,* 630 F.2d 804, 830– 31 (5th Cir.1980) (bonding company paying kickbacks to sheriff's office in return for business is sufficiently "associated with" that office); *United States v. Forsythe,* 560 F.2d 1127, 1135–36 (3d Cir.1977) (magistrate receiving bribes from local bonding agency is sufficiently "associated with" latter enterprise; alternatively, magistrates are constructive "employees" of the enterprise); *Hanna v. Norcen Energy Resources, Ltd.,* [Current] Fed.Sec.L.Rep. (CCH) ¶ 98,742 (N.D.Ohio 1982) (upholding RICO liability against accounting firm and company in connection with client enterprise's securities fraud). The defendant insurance companies here, who allegedly entered into long-term contracts with ARC entailing complicated reinsurance and financing arrangements and SCOR's service as a conduit for Reserve's income and retroceded business, and the defendant auditors, who allegedly aided the managerial defendants in operating ARC through systematic fraud, are sufficiently "associated with" or "employed by" ARC within the meaning of the statute.

Defendants SCOR and SCOR Re argue next that their alleged conduct does not entail culpability under the predicate mail fraud allegation. They first argue that no deception took place because the State Director of Insurance was aware of, and agreed to, the SCOR reinsurance agreement. SCOR neglects to mention, however, that a key to the allegedly deceptive

---

**22.** Defendants suggest that *Starnes* is distinguishable because it involved a violation alleged under § 1962(d) which makes it unlawful for a person to *conspire* to violate § 1962(c). However, in *Starnes* we explicitly determined that the same enterprise-person nexus requirements contained in § 1962(c) were independently satisfied vis-a-vis the accused arsonist. *See Starnes,* 644 F.2d at 679.

scheme, the clandestine retrocession agreement and guarantee by ARC of GRC's obligations to SCOR, were *not* disclosed to the state authorities, with the contemplated result that Reserve's *de facto* retention of liability for formally ceded business[23] secretly continued and deepened its insolvency. SCOR also argues that the fact that it entered into the reinsurance agreement several months *before* the consent decree negates any inference of SCOR's intent to defraud. The complaint, however, alleges that the negotiations in connection with the consent decree may have been underway in late 1974 at the time the SCOR agreement was concluded, with the full fraudulent impact in view and that SCOR was aware throughout subsequent years that the continued viability of the consent decree rested on the continued transmission of the fraudulent information; if proven, such facts clearly support an invocation of the mail fraud predicate offense under § 1961.

Finally, defendant Andersen suggests that the presence of the terms "he" and "his" in certain sections of RICO indicates that only biological individuals may violate RICO § 1962(c). We must reject this contention, as § 1961(3) plainly states that a violating "person" may be "any individual or entity capable of holding a legal or beneficial interest in property."

### Conclusion

There is no doubt that many theoretical and practical objections may be raised to even the most routine application of RICO's civil damage provisions. As suggested above, Congress, by granting both plaintiff and defendant status to "any person" who possesses the rudimentary connection with the operation of an enterprise through predicate offenses or who suffers injury therefrom, may well have created a runaway treble damage bonanza for the already excessively litigious. The statute, however, does not speak ambiguously, and Congress,

as RICO's legislative history indicates, was alerted to the far-reaching implications of its enactment. The legislature having spoken, it is not our role to reassess the costs and benefits associated with the creation of a dramatically expansive, and perhaps insufficiently discriminate, tool for combating organized crime. *United States v. Turkette,* 452 U.S. at 586–87, 101 S.Ct. at 2530–31 (1981).

With this principle in view, we find that the Director's complaint adequately states at least one cognizable claim under RICO, § 1962(c). We thus affirm the district court's denial of defendants' motion to dismiss Counts I, II, III and IV of the complaint. We intend to express no judgment on the merits of the complaint.

AFFIRMED.

---

**23.** It is true, as defendants note, that the allegation does not spell out in detail the precise monetary liability which Reserve effectively maintained as a result of the secret agreements, but it does assert that there was "substantial risk of loss" from the ceded business retained by the entire "ARC insurance group," which includes Reserve. We consider such an allegation, at least at this stage, adequate to suggest that SCOR could have been aware of the misleading impact of the secret guarantee.