# United States Court of Appeals
## For the First Circuit

No. 05-2868

SCOTT L. BAENA, Litigation Trustee of the
Lernout & Hauspie Speech Products, N.V. Litigation Trust,

Plaintiff, Appellant,

v.

KPMG LLP and KLYNVELD PEAT MARWICK
GOERDELER BEDRIJFSREVISOREN,

Defendants, Appellees.

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

[Hon. Patti B. Saris, U.S. District Judge]

Before
Boudin, Chief Judge,
Torruella and Howard, Circuit Judges.

Robert W. Turken and David W. Trench with whom Raquel M. Fernandez, Bilzin Sumberg Baena Price & Axelrod LLP, Dana A. Zakarian, Joel G. Beckman, William C. Nystrom and Nystrom Beckman & Paris LLP were on brief for appellant.
Michael P. Carroll with whom Michael S. Flynn, Sean C. Knowles, Phineas E. Leahey, Davis Polk & Wardwell, Kevin J. Lesinski, William J. Hanlon, Kristin G. McGurn and Seyfarth Shaw LLP were on brief for appellee KPMG LLP.
George A. Salter with whom Nicholas W.C. Corson, Hogan & Hartson LLP, Michael J. Stone and Peabody & Arnold LLP were on brief for appellee Klynveld Peat Marwick Goerdeler Bedrijfsrevisoren.

June 22, 2006

**BOUDIN**, <u>Chief Judge</u>.  Lernout & Hauspie Speech Products, N.V. ("L&H") was a Belgian company, with its U.S. headquarters in Massachusetts, engaged in developing and licensing speech recognition software.  Its first public stock offering occurred in 1995.  From 1998 to 2000, it reported soaring revenues and profits and acquired other companies; in March 2000, it contracted to acquire two U.S. companies--Dictaphone Corp. ("Dictaphone") and Dragon Systems, Inc. ("Dragon")--and took on massive new debt in connection with these acquisitions.

In August 2000, newspaper stories triggered investigations which concluded that the company had greatly overstated revenues and profits.  In November 2000, an audit ordered by the audit committee of the L&H board found that revenues during the prior two and a half years had been overstated by over a quarter billion dollars.  Ultimately, certain top officers and directors were implicated in apparent fraud; we refer to them as "the implicated managers."[1]

The accounting devices employed in overstating the revenues and profits included (it appears) recording revenue from

---

[1]Pol Hauspie (Founder and Chairman of the Board), Nico Willaert (Managing Director), Gaston Bastiaens (Chief Executive Officer and President), and Jo Lernout (Founder and Managing Director) are all implicated, and are awaiting trial in Belgium on various charges of fraud, insider trading, and stock manipulation. Carl Dammekens (Chief Financial Officer during the period in question) is also implicated by allegations in this and related lawsuits.

contracts L&H had yet to execute, booking revenue in a lump sum where the amount should have been amortized across several years, and recording revenue from clients who did not exist or who had not made payments or commitments that could properly be recorded. Following the disclosures, the chairman, managing directors and CEO (among others) resigned, and shortly thereafter L&H filed for chapter 11 reorganization in Delaware. 11 U.S.C. § 1101 et seq. (2000).

In May 2003, the bankruptcy court approved a plan of liquidation. The plan gave authority to prosecute claims on behalf of L&H to a litigation trustee appointed by a committee of unsecured creditors; there is apparently no prospect of anything being left over for stockholders. After the plan became effective, the trustee brought the present action, in August 2004, against L&H's former accountants--KPMG's U.S. and Belgian affiliates (collectively "KPMG").

The action, originally filed in the federal bankruptcy court in Delaware, was transferred to the federal district court in Massachusetts. The only claim pertinent to this appeal was brought under Mass. Gen. Laws ch. 93A §§ 1-11 (2002). The complaint also charged, as tort violations, aiding and abetting the breach of a fiduciary duty and accounting malpractice, but the district court dismissed these two claims as barred by the statute of limitations and no appeal has been taken as to them.

Chapter 93A, so far as it applies to business-to-business transactions, provides a civil cause of action, with the possibility of multiple damages and attorneys' fees for willful violations, for unfair or deceptive trade practices. Id. § 11. To apply at all, it requires a level of fault going beyond mere negligence, Darviris v. Petros, 812 N.E.2d 1188, 1192-94 (Mass. 2004), and also connections between the wrong and Massachusetts that for present purposes the parties assume to be satisfied.[2]

The complaint charged that KPMG had wide access to L&H's financial records and activities; that despite discovering and in some cases warning managers of serious problems, KPMG failed to alert the independent directors of L&H and instead issued unqualified opinions and certified balance sheets and operating statements of L&H for fiscal years 1998 and 1999; and that these actions permitted L&H to proceed with the Dictaphone and Dragon acquisitions, thereby incurring $340 million in new debt which after the disclosures it could not repay.

The allegations include but go beyond claims of negligence by KPMG and in effect charge that the accounting firms knowingly tolerated patently improper accounting practices by L&H

---

[2]L&H had its U.S. headquarters in the state and KPMG-US did its principal auditing for L&H from its Massachusetts office. The statute requires that the objected-to conduct occur "primarily and substantially within the commonwealth," Mass. Gen. Laws ch. 93A § 11; KPMG challenged the adequacy of Massachusetts contacts in the district court but the issue is not before us on this appeal.

in order to retain a lucrative client for KPMG.  These are only allegations but, because the claim was disposed of on a motion to dismiss, Fed. R. Civ. P. 12(b)(6), we must assume the allegations to be true.  Rogan v. Menino, 175 F.3d 75, 77 (1st Cir.), cert. denied, 528 U.S. 1062 (1999).

In moving to dismiss the complaint, KPMG argued, so far as is pertinent to this appeal, (1) that it was charged in substance only with negligence, which is not embraced by chapter 93A; (2) that the chapter 93A claim belonged to the creditors individually and not L&H, for whom the trustee alone could sue; and (3) that such a claim in all events was barred by the doctrine of in pari delicto.

In a decision dated September 27, 2005, the district court agreed with KPMG that in pari delicto barred the trustee's claim under chapter 93A and dismissed the action.  On this appeal, the trustee challenges the in pari delicto ruling.  KPMG defends the ruling as correct, and as alternative grounds for affirming the dismissal says the trustee also lacks standing and that the allegations did not make out a claim under chapter 93A.[3]

Objections based on "standing" must be addressed at the threshold if they implicate our authority to hear a case under

_____

[3]KPMG-Belgium independently asserts that any claim that survives against it should be tried in Belgium, an argument also pled in the district court, on grounds of forum non conveniens or international comity.  The district court did not reach these issues and neither do we.

-5-

Article III of the Constitution. <u>Steel Co.</u> v. <u>Citizens for a Better Env't</u>, 523 U.S. 83, 94-95 (1998). At different times KPMG has made, and tangled together, two different standing arguments. On close scrutiny, neither one presents a serious standing objection under Article III.

A common formulation of Article III standing is that the plaintiff must allege injury, fairly traceable to the defendant's conduct, that a court can redress. <u>Valley Forge Christian Coll.</u> v. <u>Americans United for Separation of Church and State, Inc.</u>, 454 U.S. 464, 472 (1982); <u>Becker</u> v. <u>Fed. Election Comm'n</u>, 230 F.3d 381, 384-85 (1st Cir. 2000), <u>cert. denied</u>, 532 U.S. 1007 (2001). The statement's simplicity is deceiving; the requirements present endless complexities. <u>See</u> Chemerinsky, <u>Federal Jurisdiction</u> § 2.3, at 56-113 (4th ed. 2003).

In its appellate brief, KPMG argues principally that the trustee in this case is seeking redress for an injury to the creditors, that the creditors must present their own claims directly by suing as plaintiffs themselves, and that therefore this is a classic case of a plaintiff (the trustee) who is wrongly seeking to assert the claims of others (the creditors) who are not parties to this case. <u>See, e.g.</u>, <u>Warth</u> v. <u>Seldin</u>, 422 U.S. 490, 509-10 (1975).

Courts often do use the term "standing" for cases in this category, but--illustrating one of the complexities--they normally

-6-

say that the question of who may assert an otherwise proper claim is an issue of "prudential," rather than Article III, standing. Valley Forge, 454 U.S. at 474-75; Chemerinsky, supra § 2.3.4, at 83. After all, courts can be empowered to hear claims of injury to others; trustees, parents and guardians make such claims all the time. Objections of this kind do not have to be resolved at the threshold under Steel Co. See 523 U.S. at 97-98 & n.2; McBee v. Delica Co., Ltd., 417 F.3d 107, 127 (1st Cir. 2005).

In any event this objection is without merit. A creditor who relied on false earnings statements might under certain circumstances have a claim against a complicit accountant. See Nycal Corp. v. KPMG Peat Marwick LLP, 688 N.E.2d 1368, 1371-74 (Mass. 1998). But the trustee in this case does not even purport to be asserting such claims: in the complaint the trustee advances only claims of L&H, which under the plan of reorganization, he is entitled to do. See also 11 U.S.C. §§ 323, 541(a)(1) (2000).

That the creditors will benefit if such a suit is successful does not mean that their own claims against KPMG are at issue. See Official Comm. of Unsecured Creditors v. R.F. Lafferty & Co., Inc., 267 F.3d 340, 348-49 (3d Cir. 2001). They will benefit because they have claims against L&H, it is bankrupt, and under the plan they have access to the company's residual assets; among the assets are such claims as L&H may have against KPMG. There is no threat that such a creditor or any other plaintiff will

be allowed to recover twice for the same loss. See Dobbs, Law of Remedies § 3.3(7), at 231-32 (2d ed. 1993).

Of more interest is a different "standing" objection that KPMG asserted in the district court; whether KPMG is renewing the objection on this appeal is unclear, but if it were a valid Article III objection we would have to dismiss sua sponte. Spenlinhauer v. O'Donnell, 261 F.3d 113, 120 (1st Cir. 2001). This is the argument that inflating its earnings cannot have injured L&H itself: at worst, this inflation led L&H to borrow and expend money on the strength of its false documents--but for which L&H received valuable assets in the acquisition of Dictaphone and Dragon.

The intuitive appeal of such arguments is that where a company inflates its earnings, the victims may appear to be only others (who loan it money or buy its stock) and the company may seem to be the culprit rather than an "injured" party. Yet, if one looks at long-term consequences, the company may suffer as well (witness Enron). Federal courts have been unsympathetic to this kind of "no harm" argument, devising counter-doctrines to answer it. E.g., Schacht v. Brown, 711 F.2d 1343, 1348 (7th Cir.) ("deepening insolvency"), cert. denied, 464 U.S. 1002 (1983).

How Massachusetts would view the argument is unclear, but this "no harm" argument does not have the look and feel of an Article III objection. That L&H "in fact" suffered harm from KPMG's alleged wrongdoing is colorably asserted, the trustee has

-8-

authority to act as plaintiff with respect to such a claim, and any injury can be redressed with damages. This is a controversy perfectly fit for judicial resolution under Article III. Whether state law permits recovery for misconduct providing a short-term benefit to, but inflicting long-term injury on, the company is probably best viewed as a merits issue which we need not resolve.

We may avoid it because, like the district court, we think that the chapter 93A claim is barred by the in pari delicto doctrine, to which we now turn. In agreement with the parties, we treat the question whether the in pari delicto defense applies as one of Massachusetts law. The identified Massachusetts contacts to one side, see note 2, above, the chapter 93A cause of action is uniquely created by Massachusetts law, which presumptively also determines the substantive defenses available.[4]

What the trustee has charged under chapter 93A is essentially a fraud, knowingly tolerated or abetted by KPMG, but primarily one committed by L&H's own management in misstating its earnings. The fraud is one from which L&H could expect to benefit, at least in the short run, notably (as to the acquisitions in question) by making it easier to acquire the target companies with inflated stock or through loans secured on more favorable terms.

---

[4]Although the district court referred to this as a diversity case, it is actually a state law claim which is in federal court based on the court's bankruptcy jurisdiction. 28 U.S.C. § 1334 (2000). Happily, the ramifications (if any) of this distinction for choice of law and Erie issues need not be pursued in this case.

Accordingly, KPMG argues that recovery "by L&H" against KPMG would be barred by the in pari delicto doctrine and so the trustee-- standing in L&H's shoes--is also forestalled.

In pari delicto, which literally means "in equal fault," Black's Law Dictionary 791 (6th ed. 1990), is a doctrine commonly applied in tort cases to prevent a deliberate wrongdoer from recovering from a co-conspirator or accomplice. It is applied by Massachusetts courts in tort cases,[5] including claims under chapter 93A. Choquette v. Isacoff, 836 N.E.2d 329, 332 (Mass. App. Ct. 2005); GTE Prods. Corp. v. Broadway Elec. Supply Co., 676 N.E.2d 1151, 1156 (Mass. App. Ct. 1997).

The doctrine is sometimes described (dubiously) as one of standing, e.g., Shearson Lehman Hutton, Inc. v. Wagoner, 944 F.2d 114, 120 (2d Cir. 1991), but this usage has nothing to do with Article III requirements. Chemerinsky, supra § 2.3.1, at 60. In substance, the doctrine offers a policy-based defense reflecting an obvious but visceral judgment, one echoed in other, somewhat different legal doctrines, e.g., the "unclean hands" defense in equity, Dobbs, supra § 2.4(2), at 68-72, and contributory

---

[5]See Stewart v. Roy Bros., Inc., 265 N.E.2d 357, 365 (Mass. 1970); Council v. Cohen, 21 N.E.2d 967, 970 (Mass. 1939); Berman v. Coakley, 137 N.E. 667, 669 (Mass. 1923). The full maxim is in pari delicto potior est conditio defendentis, meaning "[i]n a case of equal or mutual fault, the position of the [defending party] is the better one." Black's Law Dictionary at 791.

negligence in tort actions, Prosser & Keeton on Torts § 65, at 451-62 (5th ed. 1984).

The trustee argues that no Massachusetts precedent applies the in pari delicto doctrine in a case just like this one; but this is no answer to Massachusetts case law endorsing the concept. The trustee's more serious counters are of two kinds: asserted doctrinal exceptions to in pari delicto, and, more broadly, a claim that its application would undermine federal law and policy. The trustee also suggests that an issue of fact precluded a grant of the motion to dismiss.

Here, assuming fraudulent financial statements, senior L&H management were, on the trustee's own version of events, the primary wrongdoers. Thus, in the ordinary course, Massachusetts courts would not allow L&H managers to sue a secondary accomplice such as KPMG for helping in the wrong. Choquette, 836 N.E.2d at 332-33; see also GTE, 676 N.E.2d at 1156. And, if the managers' actions are imputed to L&H, neither could L&H (via the trustee) recover against KPMG.

A corporation is a legal entity managed by a board and officers, represented by agents, and owned by stockholders. The question of just whose actions should be imputed to "the corporation," and what exceptions should exist to such imputation, arises naturally in applying the in pari delicto doctrine, as in many other contexts. See Reuschlein & Gregory, The Law of Agency

-11-

and Partnership § 3, at 9-10 (2d ed. 1990). State law on imputation is not necessarily uniform from one jurisdiction to the next, but we only concern ourselves with the Massachusetts standard for purposes of this appeal.

In this case, the trustee himself asserts that the chairman of the board, the CEO and the managing directors were all knowing parties to the financial statements. The approval and oversight of such statements is an ordinary function of management that is done on the company's behalf, which is typically enough to attribute management's actions to the company itself. Restatement (Second) of Agency § 257 (1958); Reuschlein & Gregory, supra § 97, at 167-68; see also Lafferty, 267 F.3d at 358-59; Askanase v. Fatjo, 130 F.3d 657, 666 (5th Cir. 1997).

Massachusetts might take a narrow view of imputation in the context of in pari delicto, but nothing indicates that it does. See Sunrise Props., Inc. v. Bacon, Wilson, Ratner, Cohen, Salvage, Fialky & Fitzgerald, P.C., 679 N.E.2d 540, 543 (Mass. 1997). The trustee does not argue that under traditional standards imputation in this case would be improper, but instead argues that the doctrine should not apply in this case because of two asserted limitations that the trustee ascribes to it: the "adverse interest" exception and the far less well-established notion that the doctrine should not apply where "innocent decision-makers" could have prevented the harm.

The former limitation, which is widely recognized, see Restatement (Second) of Agency § 282(1); Lafferty, 267 F.3d at 359, does not preclude "wrongdoing" of its officers from being imputed to the company, a view that would wipe out corporate liability on many fronts. Rather, imputation may be avoided where the wrongdoing is done primarily for personal benefit of the officer and is "adverse" to the interest of the company. If the salesman uses the company car in a bank robbery, the company is not normally liable. See Prosser & Keeton, supra § 70, at 503-05 (frolic and detour).

The present case is not of that kind. A fraud by top management to overstate earnings, and so facilitate stock sales or acquisitions, is not in the long-term interest of the company; but, like price-fixing, it profits the company in the first instance and the company is still civilly and criminally liable, cf. Am. Soc'y of Mech. Eng'rs, Inc. v. Hydrolevel Corp., 456 U.S. 556, 575-76 (1982). Nor does it matter that the implicated managers also may have seen benefits to themselves--that alone does not make their interests adverse.[6]

The trustee claims that whether the implicated managers' conduct was adverse to L&H is a question of fact improperly

---

[6]See, e.g., Beck v. Deloitte & Touche, 144 F.3d 732, 736 (11th Cir. 1998); FDIC v. Shrader & York, 991 F.2d 216, 223-24 (5th Cir. 1993), cert. denied, 512 U.S. 1219 (1994); see also Restatement (Second) of Agency § 282(1).

-13-

resolved on a motion to dismiss. See Wang Labs., Inc. v. Bus. Incentives, Inc., 501 N.E.2d 1163, 1167 (Mass. 1986). "Adverse interest" in the context of imputation means that the manager is motivated by a desire to serve himself or a third party, and not the company, the classic example being looting. See Beck v. Deloitte & Touche, 144 F.3d 732, 737 (11th Cir. 1998). If there were raw facts at issue that (if credited by a factfinder) might make out a claim for looting, or if the case for imputation were merely a close one, we might agree with the trustee's argument and leave this question to the factfinder.

But this is not such a case. Nowhere does the complaint suggest that the defalcating managers were acting solely out of self-interest or otherwise attempting primarily to benefit anyone other than the company through their behavior. There are no facts in dispute that would warrant application of the adverse interest exception to bar imputation; the trustee's allegations (properly relied upon on a motion to dismiss) counsel just the opposite.

Whether or not application of the in pari delicto doctrine should depend on imputation rules borrowed from agency law is debatable. On this and related issues, such as the no-harm argument, conflicting policies are in play: one view stresses the "innocent" stockholders, FDIC v. O'Melveny & Myers, 61 F.3d 17, 19 (9th Cir. 1995); the other, such countervailing concerns as maintaining incentives for the proper selection of management,

Cenco Inc. v. Seidman & Seidman, 686 F.2d 449, 455-56 (7th Cir.), cert. denied, 459 U.S. 880 (1982).

In all events, ordinary agency-based imputation rules appear to operate in Massachusetts, as elsewhere, whether the issue is primary liability of the company or in pari delicto. Cf. Rea v. Checker Taxi Co., 172 N.E. 612, 614 (Mass. 1930). It is not our job to make new law for Massachusetts by adopting a peculiarly narrow view of the adverse interest exception in in pari delicto cases; such alterations, if deemed wise, are for the state courts. See Gill v. Gulfstream Park Racing Ass'n., 399 F.3d 391, 402 (1st Cir. 2005).

The same caution against making new state law argues against a yet more radical alteration urged by the trustee, namely, that the in pari delicto doctrine should be dispensed with where independent directors in the company could, if alerted, have frustrated the fraud. This proposed limitation clearly deviates from traditional agency doctrine; a company president who engages in price-fixing leaves his corporation liable even if the board of directors, had it known, would have stopped him. E.g. Hydrolevel, 456 U.S. at 570-74.

The "innocent decision-maker" limitation, as the trustee calls it, has been adopted in a few trial courts in the Second Circuit to bar in pari delicto defenses against a bankruptcy trustee seeking to recover against outside professionals, e.g. In

-15-

re Sharp Int'l Corp., 278 B.R. 28, 36 (Bankr. E.D.N.Y. 2002); Wechsler v. Squadron, Ellenoff, Plesent & Sheinfeld, L.L.P., 212 B.R. 34, 36 (S.D.N.Y. 1997). But the Second Circuit has reserved the issue, In re The Bennett Funding Group, Inc., 336 F.3d 94, 101 (2d Cir. 2003); see also In re CBI Holding Co., 311 B.R. 350, 371-72 (S.D.N.Y. 2004), and there is no sign of this limitation in Massachusetts decisions.

This brings us to the trustee's final argument against in pari delicto, which comes in two forms. First, the trustee says that under reforms in federal securities law, the accounting firms can be viewed as having an independent federal responsibility to alert the company's audit committee and independent directors to wrongdoing by management. 15 U.S.C. § 78j-1(a)-(b) (2000). And, the trustee argues, allowing the in pari delicto defense frustrates this federal interest.

The argument in this form is easily answered, as the district court did, by pointing out that the trustee is not asserting any cause of action under the federal statute. Congress might create such a civil claim by the company for accountant wrongdoing; but the existing federal statute does not require Massachusetts to abolish or modify a state law defense (in pari delicto) to a state cause of action (chapter 93A). The trustee does not even attempt to develop a serious claim of preemption. Compare O'Melveny & Myers v. FDIC, 512 U.S. 79, 85-89 (1994).

-16-

There is a stronger, less "federal" version of the argument, which may be a minor theme in the trustee's appellate brief and is probably the best argument for reversal. The same policy that underlies the federal statute--loosely, conscripting accounting firms as policemen--is one that Massachusetts could also adopt, and, among various ways to implement it, the state could choose to expand the prospect of civil liability for defaulting accountants by limiting the use of the in pari delicto doctrine in cases such as this one.

This is a change which, for obvious reasons (fair warning, incentive effects), one might more readily expect to be done prospectively by legislation; but whether by the legislature or a court, the change depends on a policy judgment that remains debatable. Certainly, expanding accounting firms' liability in cases like the present one would create added incentives for accountants to expose wrongdoing by management; but what about the need for, and cost of, providing such a new incentive?

On the need side, KPMG properly observes that it already has a great deal of incentive to ensure accurate reporting, pointing to the heavy payouts it has made to former L&H shareholders in suits that they brought against it in their own right.[7] And more incentives are not automatically costless: apart

_____

[7]Shareholders of L&H who purchased stock between 1998 and 2000 brought claims under the federal securities laws against L&H's officers and directors and KPMG. These claims withstood dismissal,

-17-

from any (perhaps speculative) weakening of stockholder incentives to police management, see Cenco, 686 F.2d at 455-56; compare In re Cendant Corp. Sec. Litig., 139 F. Supp. 2d 585, 597-98 (D.N.J. 2001), increased civil exposure must ultimately raise the price of accounting services.

A final argument, not made by the trustee, is that a few courts, but still distinctly in the minority, have said that in pari delicto is an equitable doctrine (probably a better rubric than standing) and have also concluded (far more debatably) that it could be inequitable to apply it where prior management was at fault but the claim was asserted on behalf of creditors or shareholders. FDIC v. O'Melveny & Myers, 61 F.3d 17, 19 (9th Cir. 1995); Scholes v. Lehmann, 56 F.3d 750, 754 (7th Cir.), cert. denied, 516 U.S. 1028 (1995).

This is just a variation on the innocent decision-maker theme, with slightly different conditions and results, but we have not been cited (nor have we found) any Massachusetts case law in favor of this minority view. Much wrongdoing has ripple effects, and who should be entitled to collect for harm, even where causation can be shown, is one of the continuing problems for

---

In re Lernout & Hauspie Sec. Litig., 230 F. Supp. 2d 152, 163-68 (D. Mass. 2002), and were eventually settled by KPMG for $115 million. The former shareholders of Dragon and Dictaphone also filed claims against KPMG for false or misleading statements in connection with the acquisitions, claims which were also settled by KPMG out of court.

legislatures and courts.  As we have said, changes in existing law should come from the Massachusetts authorities.

Affirmed.