# United States Court of Appeals
## For the First Circuit

No. 23-1747

IN RE: PUERTO RICO PUBLIC FINANCE CORPORATION,

Debtor,

THE FINANCIAL OVERSIGHT AND MANAGEMENT BOARD FOR PUERTO RICO, as
administrative supervisor for Puerto Rico Public Finance
Corporation,

Petitioner, Appellee,

v.

AMERINATIONAL COMMUNITY SERVICES, LLC, as servicer for GDB Debt
Recovery Authority; CANTOR-KATZ COLLATERAL MONITOR LLC, as
collateral monitor for DRA Bondholders,

Objectors, Appellants,

INVESCO ADVISERS, INC.; YUSIF MAFUZ-BLANCO; PUERTO RICO FISCAL
AGENCY AND FINANCIAL ADVISORY AUTHORITY; U.S. BANK TRUST
NATIONAL ASSOCIATION, as Trustee under the Trust Agreement
between PFC and U.S. Bank dated as of June 1, 2004; U.S. BANK
NATIONAL ASSOCIATION, as Trustee under the Trust Agreement
between PFC and U.S. Bank dated as of June 1, 2004,

Respondents, Appellees,

FIR TREE CAPITAL MANAGEMENT, LP,

Creditor, Appellee,

GDB DEBT RECOVERY AUTHORITY,

Interested Party, Appellee.

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF PUERTO RICO

[Hon. Laura Taylor Swain,* U.S. District Judge]

Before

Montecalvo, Lipez, and Rikelman,
Circuit Judges.

Nayuan Zouairabani-Trinidad, with whom Arturo J. García-Solá and McConnell Valdés LLC were on brief, for appellant AmeriNational Community Services, LLC.

Benjamin S. Kaminetzky, with whom Brian M. Resnick, Marc J. Tobak, Stephanie Massman, Tess Liegeois, Davis Polk & Wardwell LLP, Carmen D. Conde Torres, William J. Alemañy-Mendez, and C. Conde & Associates were on brief, for appellant Cantor-Katz Collateral Monitor LLC.

Matthew P. Kremer, with whom Peter Friedman and O'Melveny & Myers LLP were on brief, for appellee Puerto Rico Fiscal Agency and Financial Advisory Authority.

Pieter H.B. Van Tol, III, with whom Ronald J. Silverman, Sara M. Posner, Katherine B. Wellington, Hogan Lovells US LLP, Eric A. Tulla, and Rivera, Tulla and Ferrer, LLC were on brief, for appellees U.S. Bank Trust National Association and U.S. Bank National Association.

Andrew D. Behlmann, with whom Michael Papandrea, Lowenstein Sandler LLP, Nayda I. Pérez-Román, and Toro Colón Mullet P.S.C., were on brief, for appellee Fir Tree Capital Management, LP.

Brian S. Rosen and Proskauer Rose LLP on brief for appellee Financial Oversight and Management Board for Puerto Rico.

Manuel Fernández-Bared, Linette Figueroa-Torres, Toro Colón Mullet P.S.C., Douglas Buckley, and Kramer Levin Naftalis & Frankel LLP on brief for appellee Invesco Advisers, Inc.

_____

* Of the Southern District of New York, sitting by designation.

- 2 -

July 17, 2024

**RIKELMAN**, <u>Circuit Judge</u>.  This appeal stems from the restructuring of Puerto Rico's public debts under Title VI of the Puerto Rico Oversight, Management, and Economic Stability Act ("PROMESA").  Although the specific debt restructuring transaction at the heart of this appeal is complex, the legal issue before us is straightforward: Do the preliminary or final transaction documents control?  Especially when the preliminary documents make clear that they are provisional, and the final documents state that they replace any earlier agreements, the final documents must govern under basic contract law principles.  The district court concluded as much, and we agree and affirm.

## I. BACKGROUND

This case involves an array of Puerto Rico government entities, creditors, debt instruments, and legal documents.  It also involves two "Qualifying Modifications": the 2018 restructuring of the debts of the Government Development Bank ("GDB," and the "GDB Qualifying Modification"), and the 2022 restructuring of the debts of the Public Finance Corporation ("PFC," and the "PFC Qualifying Modification").  We explain the complex facts involved in this appeal below.

### A. Relevant Facts

GDB is a largely inactive government agency that was established to "aid the Commonwealth Government in the performance of its fiscal duties" and to "develop the economy of Puerto Rico."

P.R. Laws Ann. tit. 7, § 551.  One of its subsidiaries is PFC. Between August 2011 and June 2012, GDB issued standby letters of credit (the "PFC Letters of Credit") to certain PFC bondholders (the "PFC Creditors").  A standby letter of credit is a guarantee of a debt owed by a third party (in this case, GDB guaranteed PFC's bonds).  See Itek Corp. v. First Nat'l Bank of Bos., 704 F.2d 1, 8 (1st Cir. 1983) (citing Douglas G. Baird, Standby Letters of Credit in Bankruptcy, 49 U. Chi. L. Rev. 130, 135 (1982)).

Unfortunately, Puerto Rico's public finances deteriorated after 2012.  Facing a growing financial crisis, the Government of Puerto Rico implemented a moratorium on debt-service payments in 2016, including GDB's payments to the PFC Creditors based on the PFC Letters of Credit.  Congress enacted PROMESA shortly thereafter.  In early 2017, GDB and its parent entity, the Puerto Rico Fiscal Agency and Financial Advisory Authority ("AAFAF" by its Spanish acronym), began to consider restructuring GDB's debts.

PROMESA contains two mechanisms -- one in Title III and one in Title VI -- for restructuring Puerto Rico's public debts.[1]

---

[1] "Title III" and "Title VI" refer to the portions of the PROMESA legislation as originally enacted by Congress. See Puerto Rico Oversight, Management, and Economic Stability Act, Pub. L. No. 114-187, tits. III, VI, 130 Stat. 549, 577, 603 (2016) (Title III codified at 48 U.S.C. §§ 2161-78; Title VI codified at 48 U.S.C. §§ 2231-32).

The Title III restructuring process mirrors traditional bankruptcy court proceedings and permits a party to petition a federal court to compel the creation and enforcement of a plan of adjustment. See 48 U.S.C. § 2164 (describing petition process under Title III); see also id. § 2161(a) (incorporating provisions of the bankruptcy code). By contrast, Title VI of PROMESA allows municipal entities to enter voluntary and binding restructuring arrangements, called Qualifying Modifications, with the consent of a supermajority of their creditors. See id. § 2231(g), (j). The resulting debt adjustment -- which is just an agreement or set of agreements between the municipal borrowers and their creditors -- becomes a "Qualifying" Modification if the Financial Oversight and Management Board for Puerto Rico ("FOMB") certifies that it complies with PROMESA and a federal district court approves it. Id. § 2231(g)(2), (m)(1)(B), (m)(1)(D). The key feature of Title VI is that a finalized Qualifying Modification becomes "conclusive and binding on all holders of Bonds whether or not they have given . . . consent." Id. § 2231(m)(1) (emphasis added).

At the direction of Puerto Rico's legislature,[2] GDB began initial negotiations to restructure its debts under Title VI in 2017. These negotiations resulted in a Restructuring Support

_____

[2] Through the 2017 GDB Debt Restructuring Act, the Puerto Rico legislature formally directed GDB to seek a "restructuring transaction" under Title VI. P.R. Laws Ann. tit. 7, § 3162.

Agreement (the "RSA") with GDB's major creditors, which outlined the terms of a consensual reorganization of GDB's debts. The RSA was executed on May 15, 2017, and included a Term Sheet detailing important aspects of the proposed GDB Qualifying Modification. The Term Sheet provided that GDB's creditors would swap their existing bonds for new bonds worth fifty-five cents on the dollar. These new bonds would be issued by the Debt Recovery Authority ("DRA"), an independent public trust created by the legislature to facilitate the GDB Qualifying Modification.[3] See P.R. Laws Ann. tit. 7, § 3171. As part of the Title VI process, GDB would transfer most of its assets to DRA to provide collateral for the new bonds.[4] DRA would then transfer title to those assets to Wilmington Trust, as the Indenture Trustee, to hold the property for payment on the DRA bonds.

Key to the case before us, Schedule 2 of the Term Sheet described GDB's outstanding contingent and unliquidated bond claims, including its debt to the PFC Creditors under the PFC Letters of Credit. In a footnote, the Term Sheet specified that although the PFC Creditors were eligible to receive a "pro rata distribution" of the new DRA bonds to satisfy GDB's guarantee, DRA

---

[3] The key documents in this appeal thus refer to DRA as "the Issuer."

[4] Many of the RSA's provisions were also reflected in the GDB Restructuring Act. See, e.g., P.R. Laws Ann. tit. 7, § 3194(a) (directing transfer of collateral property).

would issue new bonds <u>after closing</u>[5] only if the PFC Creditors first demonstrated "valid claims."  The provision read in full:

> No New Bonds will be issued at closing in respect of contingent and unliquidated claims as to which no claim has been made prior to the Closing Date.  <u>If, subsequent to the Closing Date, valid claims are made</u> on any contingent and unliquidated claim specified in Schedule 2, the Holders of such claims will receive a pro rata distribution of the New Bonds.

(Emphasis added.)  The parties refer to this condition as the Valid Claim Requirement, and it forms the flash point in this appeal.

Although many of the Term Sheet's provisions were later reflected in the GDB Qualifying Modification, the Term Sheet made clear that it did "not constitute a commitment by any party" and that it was subject "without limitation" to "requisite approvals under Title VI of PROMESA," as well as "<u>execution and delivery of definitive agreements (the 'Definitive Documents').</u>"  (Emphasis added.)  Once the Definitive Documents were executed and delivered, the RSA would "automatically be deemed amended to replace the . . . Term Sheet with the Definitive Documents."

Around August 9, 2018, GDB began to solicit consent for its Qualifying Modification from all GDB creditors, including those who had not already agreed to the RSA.  It did so through an

---

[5] As set out in the Term Sheet and the Solicitation Statement, which we examine in greater detail below, the Closing Date is the date on which GDB's creditors would exchange their existing bonds for new DRA bonds to consummate the GDB Qualifying Modification.

extensive Solicitation Statement. This document outlined an array of information one would expect in a debt restructuring, including the nature of the bond transaction, the exchange ratio for swapping existing bonds for new bonds, and the collateral property. It also contained background information about GDB's financial stress and risk factors associated with the transaction. The Solicitation Statement valued the PFC Creditors' claim at $86.7 million (before the discount of fifty-five cents on the dollar) and, like the Term Sheet, described the Valid Claim Requirement.

The Solicitation Statement also warned that it was merely provisional. It cautioned that all new bonds would "be issued pursuant to the terms and conditions of the Bond Indenture, to be agreed upon by the Indenture Trustee [Wilmington Trust] and the Issuer [DRA], subject to approval by the" supermajority of bondholders required under PROMESA (the "Requisite Bondholders"). Thus, even though the Solicitation Statement "describe[d] certain expected terms and conditions of the New Bonds and the Bond Indenture," it did "not purport to be complete" and was "subject to, and . . . qualified in its entirety by reference to, all the provisions of the New Bonds and the Bond Indenture." In fact, the Solicitation Statement expressly warned that the information it contained was accurate only as of the date it was issued. It also indicated that GDB would update it to avoid misstatements or material omissions only through September 12, 2018 -- the deadline

by which the prospective Requisite Bondholders needed to provide initial consent to the RSA's terms if they wanted to proceed to negotiate a final GDB Qualifying Modification.

Around the same time, GDB and AAFAF initiated proceedings in the U.S. District Court for the District of Puerto Rico to secure approval of the proposed GDB Qualifying Modification.[6] On November 3, 2018, AAFAF filed in the district court draft versions of a Bond Indenture and Master Transfer Agreement (the "MTA") that did not include a Valid Claim Requirement.

The district court approved the GDB Qualifying Modification on November 7, 2018 (the "Approval Order"). The court approved the "Exchange Terms," which it described as the terms "particularly set forth in the RSA and described in the Solicitation Statement" to which the "parties to the Qualifying Modification have agreed" in order "to effectuate the foregoing exchange." But it also noted that "the Qualifying Modification [was] expressly conditioned upon" the "Exchange Conditions," which included "the execution and delivery of all definitive documents . . . in form and substance satisfactory to GDB and the . . . Requisite Bondholders." The court further explained

---

[6] GDB also sought approval from FOMB, which granted the required certification on November 2, 2018.

- 10 -

that "the Exchange Terms and Conditions are essential means of implementing the Qualifying Modification."

Following the Approval Order, the participants in the transaction executed the final Bond Indenture and MTA on November 29, 2018.[7] The Bond Indenture primarily governed the issuance of new bonds, and the MTA provided for the transfer of collateral property from GDB to DRA.

Importantly, Section 2.13 of the Bond Indenture stated that DRA could be required to issue "Additional Bonds" after the GDB Qualifying Modification was completed. In particular, the Bond Indenture detailed that Additional Bonds could be issued to the PFC Creditors to satisfy their contingent claims "without the consent of the [DRA] [b]ondholders and upon instructions from GDB or AAFAF." The Bond Indenture did <u>not</u> specify that valid claims had to be made before these Additional Bonds could issue.

The MTA also provided for the issuance of bonds without an explicit Valid Claim Requirement. The MTA stated that "upon the [DRA's] receipt of written instructions from GDB or AAFAF, the [DRA] shall, pursuant to the terms of the [GDB] Qualifying Modification and in accordance with the Bond Indenture, authorize . . . the issuance of Additional Bonds under the Bond

---

[7] The Bond Indenture is governed by New York law, and the MTA is governed by Puerto Rico law.

Indenture in respect of" the PFC Creditors. Notably, the MTA contained a merger clause indicating that the MTA, the Bond Indenture, and other specified "Transaction Documents" constituted the "full and entire understanding and agreement of the Parties."[8]

The Requisite Bondholders had numerous meaningful opportunities to weigh in on or object to the terms of the Bond Indenture, the MTA, and the other documents that would form the GDB Qualifying Modification. Indeed, they had veto power over the Bond Indenture. The Solicitation Statement explained that the Bond Indenture was "to be agreed upon by the Indenture Trustee and the Issuer, subject to approval by the Requisite Bondholders." Similarly, the RSA provided that the Definitive Documents, including the Bond Indenture and the MTA, would be "in form and substance reasonably satisfactory to . . . the Requisite Bondholders" and would become part of the GDB Qualifying Modification only "[u]pon written confirmation of an agreement . . . among the GDB Parties and the Requisite Bondholders." Thus, these documents were extensively negotiated with the Requisite Bondholders, who had approval rights over them.

---

[8] The term "Transaction Documents" is defined as the "Indenture, the Bonds, the Transfer Agreement, the Servicing Agreement, the Keepwell Agreement, the Disclosure Agreement, the Collateral Monitor Agreement, and the Collateral Monitor Fee Letter." In re P.R. Pub. Fin. Corp., 686 F. Supp. 3d 73, 78 n.4 (D.P.R. 2023).

The parties also filed draft versions of the Bond Indenture and the MTA in the 2018 district court proceedings, and the Requisite Bondholders did not object to the absence of a Valid Claim Requirement in those documents before the court issued its Approval Order. The Requisite Bondholders had sophisticated separate counsel during the 2018 proceedings and throughout the negotiation of the Transaction Documents.

## B. Procedural History

The proceeding at the center of this appeal began about four years later. In late 2022, PFC proposed the PFC Qualifying Modification to restructure its own debts, including the 2011 and 2012 bonds guaranteed by the PFC Letters of Credit. See In re P.R. Pub. Fin. Corp., 686 F. Supp. 3d 73, 78-79 (D.P.R. 2023). On October 28, 2022, FOMB initiated a proceeding in the U.S. District Court for the District of Puerto Rico (before the same district court judge who approved GDB's restructuring) to seek approval of the PFC Qualifying Modification. See id. Under the proposed modification, DRA would be directed to issue new bonds worth approximately $47.7 million to satisfy all the outstanding contingent claims under the PFC Letters of Credit.

AmeriNational Community Services, Inc., and Cantor-Katz Collateral Monitor LLC, the appellants in this case (collectively,

the "DRA Parties"), objected to the proposed bond issuance by DRA.[9]
They maintained that the Valid Claim Requirement was an operative
term of the GDB Qualifying Modification and that none of the PFC
Creditors seeking new bonds had ever demonstrated a valid claim
against GDB.[10]  See id. at 82-83.  With the assent of the parties,
the district court bifurcated the proceedings, separating the DRA
Parties' objection to the new bond issuance from the court's
consideration of the broader PFC Qualifying Modification, which it
approved on December 30, 2022.

The district court heard arguments on the DRA Parties'
objection on May 10, 2023.  Approximately three months later, on

[9] AmeriNational and Cantor-Katz are, respectively, the designated Servicing Agent and Collateral Monitor under the GDB Qualifying Modification.  In the simplest terms, as Servicing Agent, AmeriNational acts as DRA's day-to-day asset manager to maximize DRA's returns on GDB's transferred assets.  The Servicing Agreement authorizes AmeriNational to enforce the DRA bondholders' rights in the collateral property through litigation in the name of DRA.  And as the Collateral Monitor, Cantor-Katz is tasked with protecting the interests of the DRA bondholders, including by supervising AmeriNational's performance.  DRA did not enter an appearance in this appeal, but it advised the district court below that it supported the DRA Parties' objection.  See In re P.R. Pub. Fin. Corp., 686 F. Supp. 3d at 81 n.7.

[10] The DRA Parties asserted before the district court that the Valid Claim Requirement had not been met because the PFC Creditors had not demonstrated that they had satisfied the conditions necessary to draw funds from the PFC Letters of Credit.  Moreover, the DRA Parties argued that even if those conditions had been satisfied, the amount the PFC Creditors would have been entitled to draw was vastly smaller than their $86.7 million claim.  All parties agree that the question of whether the Valid Claim Requirement has been satisfied -- assuming it exists at all -- is outside the scope of this appeal.

- 14 -

August 14, 2023, the court overruled the objection.  See id. at 85.  It held that "the definitive terms of the GDB's qualifying modification ultimately are those set forth in . . . the definitive documents governing the transaction, rather than the terms described in the [preliminary] Solicitation Statement and the Term Sheet."  Id. at 83.  Based on the language contained in the RSA, the court reasoned that the Term Sheet's reference to the Valid Claim Requirement fell out of the RSA once the parties finalized the Definitive Documents, given that the Term Sheet was explicitly subject to final documentation.  See id. at 83-84.  The court reached a similar conclusion about the Solicitation Statement, which contained express language rendering it subordinate to the Bond Indenture and indicating that it would reflect the proposed terms of the GDB Qualifying Modification only through September 2018.  See id. at 84.

The district court also noted that its 2018 Approval Order anticipated that the parties would "negotiate the definitive terms of the transaction."  Id. at 85.  That order entered after the court had reviewed draft versions of the Bond Indenture and the MTA that did not contain the Valid Claim Requirement.  See id. at 84-85.  As the court explained, "[n]o party objected" to the absence of the Valid Claim Requirement in those drafts, even though the Requisite Bondholders "had approval rights over the definitive documents."  Id. at 85.

The DRA Parties timely appealed. The district court denied their request for a stay of the latest DRA bond issuance pending appeal, as did we. In December 2023, DRA issued additional bonds worth $47.7 million to the PFC Creditors.

## II. STANDARD OF REVIEW

The district court construed the parties' filings below as cross-motions for summary judgment. We review PROMESA appeals arising from this posture de novo, considering each party's cross-motion separately. Andalusian Glob. Designated Activity Co. v. Fin. Oversight & Mgmt. Bd. for P.R., 948 F.3d 457, 466 (1st Cir. 2020). Because the district court granted summary judgment to FOMB, in evaluating whether there was any dispute of material fact and if FOMB was entitled to judgment as a matter of law, we construe the facts in the light most favorable to the DRA Parties and draw all reasonable inferences in their favor, consistent with record support. See id. As the parties agree, the meaning of the various documents that form the GDB Qualifying Modification presents a purely legal question, which we also review de novo. See Dukes Bridge LLC v. Beinhocker, 856 F.3d 186, 189 (1st Cir. 2017).

## III. DISCUSSION

With the complex facts of this case in view, the legal principles that lead us to affirm become much more straightforward.

## A. The Scope of the GDB Qualifying Modification

Our analysis begins with the Bond Indenture and the MTA, the two final Transaction Documents that allowed DRA to issue new bonds. Our interpretation of these documents is governed by the contract principles of New York and Puerto Rico law, respectively. Under New York law, an agreement between contracting parties that is reflected "in a clear, complete document" should "be enforced according to its terms." J. D'Addario & Co. v. Embassy Indus., Inc., 980 N.E.2d 940, 943 (N.Y. 2012) (citation omitted). Puerto Rico law is similar to New York law on this point. It provides that so long as "the terms of a contract are clear and leave no doubt as to the intentions of the contracting parties, the literal sense of its stipulations shall be observed." Borschow Hosp. & Med. Supplies, Inc. v. Cesar Castillo Inc., 96 F.3d 10, 15 (1st Cir. 1996) (applying Puerto Rico law and quoting P.R. Laws Ann. tit. 31, § 3471). "[A]n agreement is 'clear'" under Puerto Rico law "when it can 'be understood in one sense alone, without leaving any room for doubt, controversies[,] or difference of interpretation.'" Id. (quoting Exec. Leasing Corp. v. Banco Popular de P.R., 48 F.3d 66, 69 (1st Cir. 1995)).

The Bond Indenture and the MTA plainly permit the issuance of new DRA bonds on account of the PFC Letters of Credit at the sole direction of GDB and AAFAF, without any reference to a Valid Claim Requirement. Section 2.13 of the Bond Indenture,

which is governed by New York law, specifically provides for the issuance of new bonds to the PFC Creditors, so long as they do not exceed about $62 million[11]:

> Additional Bonds.  The Issuer [DRA] shall, without the consent of the Bondholders and upon instructions from GDB or AAFAF, . . . authorize from time to time the issuance of Additional Bonds in respect of the Contingent Claims set forth in Exhibit C[12] in the principal amount(s) specified by GDB or AAFAF, as applicable, in accordance with the instructions from GDB of AAFAF, as applicable; provided that the Additional Bonds (whether issued together or in multiple instances) shall in no event exceed $61,990,562 in aggregate original principal amount.

The maximum amount of the bond issuance is the only textual limitation on the creation of new bonds to satisfy the PFC Letters of Credit.

Similarly, Section 2(b) of the MTA, which is governed by Puerto Rico law, explains that GDB or AAFAF may instruct DRA to issue "Additional Bonds under the Bond Indenture" to satisfy the PFC Letters of Credit, up to about $62 million.  No other language

---

[11] In addition to the $86.7 million claim in favor of the PFC Creditors, GDB also owed an outstanding contingent claim for $26 million in connection with a debt-service deposit agreement with a financial institution.  The $62 million cap reflects the discounted value (at a discount of fifty-five cents on the dollar) of GDB's $112.7 million in total contingent claims as of 2018.

[12] Exhibit C refers to the PFC Letters of Credit.

in this section limits GDB or AAFAF's authority to direct the issuance of new bonds.  Section 2(b) reads:

> [A]fter the Closing Date, upon the Issuer's [DRA's] receipt of written instructions from GDB or AAFAF, the Issuer shall, pursuant to the terms of the Qualifying Modification and in accordance with the Bond Indenture, authorize from time to time the issuance of Additional Bonds under the Bond Indenture in respect of certain contingent claims against GDB set forth in Exhibit C to the Bond Indenture.  The Issuer shall issue such Additional Bonds in the principal amount(s) specified by GDB or AAFAF, as applicable, in accordance with the instructions from GDB or AAFAF, as applicable; provided that the Additional Bonds (whether issued together or in multiple instances) shall in no event exceed $61,990,562 in aggregate original principal amount.

It is clear to us from the face of these two documents that they do not include the Valid Claim Requirement.  Rather, that requirement appears only in the preliminary documents -- the Term Sheet and the Solicitation Statement.  Neither of those documents was referenced in the MTA's merger clause.  Critically, that merger clause provided that the Bond Indenture and the MTA were part of a discrete set of Transaction Documents that "constitute[d] the full and entire understanding and agreement of the Parties" and that superseded "[a]ll prior negotiations, agreements, representations, warranties, statements and

undertakings concerning the subject matter hereof."[13]  (Emphasis added.)

Nevertheless, the DRA Parties offer a variety of arguments urging us to read the Valid Claim Requirement into the Definitive Documents based on the preliminary documents (the Term Sheet and the Solicitation Statement).  As a threshold matter, looking to the preliminary documents to contradict the language of the Bond Indenture and the MTA runs against New York and Puerto Rico law, which bar the consideration of extrinsic evidence to contradict the meaning of an unambiguous agreement.  See W.W.W. Assocs. v. Giancontieri, 566 N.E.2d 639, 642 (N.Y. 1990) ("[B]efore looking to evidence of what was in the parties' minds, a court must give due weight to what was in their contract."); Borschow Hosp. & Med. Supplies, 96 F.3d at 15-16 (same, under Puerto Rico law).  Indeed, "to consider . . . extrinsic evidence at all, the court must first find the relevant terms of the agreement unclear." Exec. Leasing Corp., 48 F.3d at 69.  Particularly when an agreement

_____

[13] The DRA Parties insist that because the Requisite Bondholders were not subject to these documents, their interests cannot be impaired by the Bond Indenture or the MTA, including the MTA's merger clause.  It is true that only GDB, the Indenture Trustee, and DRA are parties to the Bond Indenture and the MTA. But the Requisite Bondholders had approval rights over the Bond Indenture and the MTA, with the knowledge that those documents would govern the issuance of future bonds.  Thus, the technical fact that they are not parties to those agreements does not let them off the hook for failing to require the inclusion of the Valid Claim Requirement in the final documents.

- 20 -

contains a merger clause, we may not "vary the express, clear, and unambiguous terms" contained in the agreement itself. <u>Borschow Hosp. & Med. Supplies</u>, 96 F.3d at 15. Thus, we are "bound to look no further than" the text of the final documents to ascertain whether any of those documents contains a Valid Claim Requirement.[14] <u>Mercado-Garcia</u> v. <u>Ponce Fed. Bank</u>, 979 F.2d 890, 894 (1st Cir. 1992).

Even if there were ambiguity in the final documents and we considered the Term Sheet and Solicitation Statement as extrinsic evidence, the DRA Parties have not pointed us to a convincing reason to conclude that the parties intended to be bound by the Valid Claim Requirement. The DRA Parties' principal contention is that the term "Definitive Documents" in the RSA includes the Term Sheet (or at least incorporates its reference to the Valid Claim Requirement), as well as the Solicitation Statement. In support, they point to the definition of "Definitive Documents" in the RSA, which encompassed:

> the documents (including any related agreements, instruments, schedules, or exhibits) that are necessary or desirable to implement, or otherwise relate to, the Restructuring, including this RSA, the Plan (including any supplements thereto), any disclosure statement, any order approving such disclosure statement, any information

---

[14] Because the documents are not ambiguous, the DRA Parties are incorrect when they argue that the district court should have permitted discovery into the negotiation process.

- 21 -

> materials required pursuant to section 601(f) of PROMESA, and the Confirmation Order, <u>in each case on terms and conditions consistent with the . . . Term Sheet</u>, PROMESA, and otherwise in form and substance reasonably satisfactory to the GDB and the Requisite Bondholders.

(Emphasis added.) Although this definition, read in isolation, could sweep broadly, we disagree with the DRA Parties' contention that the definition draws in either of the documents that refer to the Valid Claim Requirement.

Instead, both the Term Sheet and the Solicitation Statement acknowledge that the Transaction Documents govern. We begin with the Term Sheet. As we have already noted, the RSA expressly cautioned that the Term Sheet would "automatically" be "replace[d] . . . with the Definitive Documents" following the "written confirmation of an agreement . . . on, and finalization of" those documents. This sets up a conditional relationship between the Term Sheet and the Definitive Documents: once GDB and the Requisite Bondholders confirmed a final agreement in writing, the Definitive Documents replaced the Term Sheet.[15] So unless the Valid Claim Requirement was reflected in the Definitive Documents, it could not govern the issuance of new DRA bonds.

---

[15] The Restructuring Act contemplated the possibility that the RSA would be amended, including to reflect the terms of a final restructuring transaction. <u>See</u> P.R. Laws Ann. tit. 7, § 3163(ii) (providing that the RSA may "be amended from time to time in accordance with its terms").

- 22 -

The DRA Parties attempt to circumvent this problem. They point to the fact that the RSA states that the Definitive Documents must contain "terms and conditions consistent with the . . . Term Sheet." Therefore, they suggest that "in the event of any conflict . . . between the Definitive Documents and the enumerated terms of the Term Sheet, . . . the Definitive Documents are those with 'terms and conditions consistent with the . . . Term Sheet.'"

We disagree. As FOMB explains, this argument flies in the face of standard contract practice, where contracting parties regularly commit to the proposals outlined in a term sheet subject to final documentation. Under New York law (which governs the RSA), a preliminary agreement, such as a term sheet, can be binding when it does not "contemplate[] the negotiation of later agreements and if the consummation of those agreements [is not] a precondition to a party's performance." IDT Corp. v. Tyco Grp., 918 N.E.2d 913, 915 n.2 (N.Y. 2009) (holding preliminary agreement expressly subject to later "definitive agreements" was not enforceable); see Raghavendra v. Trs. of Columbia Univ., 686 F. Supp. 2d 332, 340-41 (S.D.N.Y. 2010) (holding term sheet that stated it was "final and binding upon the parties" was enforceable under New York law because it reflected a mutual intent to be bound), rev'd in part on other grounds, 434 F. App'x 31 (2d Cir. 2011). But the language of the RSA lends itself to just the opposite interpretation. See Adjustrite Sys. v. GAB Bus. Servs., 145 F.3d 543, 549 (2d Cir.

- 23 -

1998) (explaining that under New York law, "the language of [a preliminary] agreement" is "the most important" factor in determining whether it is binding (citation omitted)); see also IDT Corp., 918 N.E.2d at 916. The RSA explained that the Term Sheet did "not constitute a commitment by any party and in any event [was] subject to the terms and conditions hereof, including, without limitation, requisite approvals under Title VI of PROMESA and execution and delivery of . . . []the 'Definitive Documents'[]." (Emphases added.) Thus, it was the Requisite Bondholders' veto over the Definitive Documents that should have compelled the inclusion of a Valid Claim Requirement in the final documentation. They failed to exercise that veto, and that is why the final documents lacked a Valid Claim Requirement.

The Solicitation Statement does not fare any better. The DRA Parties contend that the Solicitation Statement falls within the RSA's definition of Definitive Documents because it is a "disclosure statement" and "otherwise relate[s] to[] the Restructuring." But we agree with the district court that "the definitive terms of the GDB's qualifying modification ultimately are those set forth in the definitive documents governing the transaction, rather than the terms described in the Solicitation Statement." In re P.R. Pub. Fin. Corp., 686 F. Supp. 3d at 83. The Solicitation Statement made clear that, like the Term Sheet, it was preliminary, not definitive. It indicated that it was

"subject to, and . . . qualified in its entirety by reference to, all the provisions of the New Bonds and the Bond Indenture."[16] The Solicitation Statement also cautioned that it did "not, under any circumstances, create any implication that the information contained in [it was] current as of any time subsequent to" its distribution.[17] Rather, the Solicitation Statement advised that GDB would update it only until September 12, 2018, months before the parties closed on the Definitive Documents on November 29, 2018. We cannot agree that the Solicitation Statement -- which was subject to later documentation and was not required to be updated to reflect further developments -- can be construed as final or "definitive," as the DRA Parties insist.

The DRA Parties respond by contending that the district court's Approval Order emphasized the importance of the terms "set forth in the RSA and described in the Solicitation Statement,"

---

[16] Without citing any legal authority, the DRA Parties insist that this provision did not adequately "warn that the Valid Claim Requirement would be excised later." But the Requisite Bondholders had approval rights over the final, executed versions of the Definitive Documents, including the Bond Indenture. And as they conceded during oral argument before us, they approved the Bond Indenture.

[17] FOMB contends that the Solicitation Statement's reference to "information contained in [it]" includes the contractual terms of the proposed transaction, such as the Valid Claim Requirement. The DRA Parties insist that the term "information" refers only to factual information about GDB. Our analysis is the same either way: The Solicitation Statement contained ample warning that it was a non-final document.

which it called the "Exchange Terms." To be sure, the Approval Order directed the parties to draft the implementing documentation "consistent with the Exchange Terms." But as the district court explained in its decision rejecting the DRA Parties' objection, the DRA Parties have assumed (mistakenly) that the Approval Order foreclosed further changes to the Exchange Terms before execution of the final documents. See In re P.R. Pub. Fin. Corp., 686 F. Supp. 3d at 83; see also United States ex rel. Nargol v. DePuy Orthopaedics, Inc., 69 F.4th 1, 12 (1st Cir. 2023) ("[A]ppellate deference is appropriate when a district court is interpreting its own order."). Instead, as the court noted, the Approval Order recognized that the GDB Qualifying Modification was "subject to and conditioned upon the consummation of the other components of the global restructuring of GDB's outstanding liabilities . . . including, among others, the execution and delivery of all definitive documents . . . in form and substance satisfactory to GDB and the . . . Requisite Bondholders." (Emphases added.) Put another way, the Approval Order contemplated not only that the Definitive Documents might deviate from the Solicitation Statement but also that it was up to the Requisite Bondholders to ensure that the final documents were "satisfactory" to them.

In our view, this last point proves decisive. The RSA made clear that the Bond Indenture was "subject to approval by the Requisite Bondholders," and the Requisite Bondholders never

- 26 -

objected to the relevant documents, either before or after the district court entered the Approval Order. Thus, as FOMB contends, the omission of a Valid Claim Requirement in the final documentation was a consequence of the Requisite Bondholders' failure to exercise their right to object. We conclude, therefore, that the GDB Qualifying Modification did not contain the Valid Claim Requirement.

## B. Standing and Equitable Mootness

Because we agree with FOMB's arguments on the scope of the GDB Qualifying Modification, we decline to reach the alternative arguments raised by the PFC Creditors and their bond trustee (collectively, the "PFC Creditor Parties") for affirming the district court's ruling. The PFC Creditor Parties contend that the DRA Parties lack standing to object on behalf of the DRA bondholders to the issuance of Additional Bonds or, alternatively, that their claims should be deemed moot on equitable grounds because the GDB Qualifying Modification already has taken effect and "could not feasibly be unwound."

DRA and the DRA bondholders clearly would have Article III standing to object to the issuance of Additional Bonds, and the PFC Creditor Parties do not assert otherwise. Instead, they contend that the district court was wrong as a matter of contract interpretation when it concluded that the Transaction Documents gave AmeriNational and Cantor-Katz, the DRA Parties, the authority

- 27 -

to object on behalf of DRA and the DRA bondholders.  However, the "determination of who may maintain an otherwise cognizable claim turns on a question of prudential standing, not one of Article III standing."  Nisselson v. Lernout, 469 F.3d 143, 151 (1st Cir. 2006) (holding that whether trustee had assigned authority to sue on behalf of former corporation's shareholders, as opposed to on behalf of corporation itself, raised only prudential concerns (citing Baena v. KPMG LLP, 453 F.3d 1, 5 (1st Cir. 2006))).  Thus, we do not have to resolve whether the DRA Parties in fact had contractual authority to object to the issuance of Additional Bonds on behalf of DRA and the DRA bondholders before reaching the merits here.  Id. (citing Steel Co. v. Citizens for a Better Env't, 523 U.S. 83, 97-98 & n.2 (1998)).  Accordingly, given that the PFC Creditor Parties' arguments do not trigger any Article III concerns and the DRA Parties' objections fail on the merits, we elect to "bypass" these non-jurisdictional disputes.  Id.

The PFC Creditors' argument concerning equitable mootness also presents only non-jurisdictional considerations that we need not reach.  The equitable mootness doctrine allows, but does not require, courts to dismiss a pending appeal on equitable grounds in order to avoid upsetting an implemented plan of adjustment.  See Pinto-Lugo v. Fin. Oversight & Mgmt. Bd. for P.R., 987 F.3d 173, 180 (1st Cir. 2021) (applying equitable mootness in a Title III proceeding).  The PFC Creditor Parties pursue it only

as an alternative ground for affirming, and reaching the argument would require us to decide an issue of first impression: whether equitable mootness applies in Title VI proceedings.  We see no need to address that question here.

## IV. CONCLUSION

For all these reasons, we **<u>affirm</u>** the district court's ruling.